## IN RE WELLCOME.

[No. 1,401.]

[Submitted December 11, 1899. Decided December 23, 1899.]

*Attorney at Law — Bribery — Disbarment Proceedings — Trial — Failure of Accused to Testify — Presumption of Innocence—Reasonable Doubt — Witnesses—Impeachment— Evidence — Detective — Reputation of Accused — Acts Not Connected With Professional Conduct—Quantum of Proof.*

1.  A proceeding for disbarment is not a criminal prosecution, nor in aid of criminal investigation, and Penal Code, Section 2442, providing that the failure of the accused to testify in his own behalf shall not be used to his prejudice, has no application to such proceeding.

2.  In disbarment proceedings, where the accused did not testify in his own behalf, the presumption of his innocence remains with him only until it appears to the court with reasonable certainty that he is guilty, and then it is incumbent upon him to speak.

3.  The rule in criminal prosecutions that the guilt of the accused must be proved beyond a reasonable doubt does not apply to proceedings for disbarment.

4.  The testimony of two witnesses to acts by the accused constituting bribery is not impeached by that of six witnesses from the localities where the two live, to the effect that they bear a bad reputation for truth, when the six are the political opponents of the two, and some of them had had personal differences with the two, and others testified that they had a good opinion of the two until they testified to the bribery.

5.  The testimony of two credible witnesses to acts by the accused constituting bribery was a relation involving much detail and many incidents, and was given by both on three separate occasions without material variation, and was corroborated by the production by one of them of a large sum of money which they claimed to have received as a bribe from the accused, and the witness producing the money was a man of small means. The accused failed, without reason, to testify in his own behalf, and his attorneys answered on information and belief only. *Held,* there being no evidence to the contrary, that the evidence given was sufficient to establish the guilt of accused.

6.  That the accused had always borne an excellent reputation for integrity is in his favor during trial, but is no defense to the crime if actually committed.

7.  That the principal witness in disbarment proceedings against the accused was a brother lawyer, and secured his evidence in a reprehensible manner, by acting as detective, and apparently entering into a criminal plan with the accused, in order to expose him, does not, of itself, render his evidence unworthy of belief.

8.  Under the Montana statute, offenses within the line of professional duties and those without these lines, stand upon the same footing so far as concerns the quantum of proof necessary to establish them.

ORIGINAL proceedings to disbar John B. Wellcome. Judgment of disbarment.

*Mr. C. B. Nolan, Amicus Curiae.*

*Mr. Wm. Wallace, Jr., Messrs. Carpenter & Carpenter, Mr. F. E. Corbett, Mr. Jesse B. Roote,* and *Messrs. Cullen, Day & Cullen,* for the Accused.

**PER CURIAM.**—In the written accusation filed in this proceeding are contained specific charges of bribery, and also of conspiracy to bribe and to corruptly influence the official action of members of the Sixth Legislative Assembly in the election of a United States senator. Some of the charges are upon knowledge, and others upon information and belief. Questions arising out of objections to the form and substance of the charges were considered and determined in the former opinions of this Court, reported in 23 Mont. 140, 213, 58 Pac. 45, 47. Of the charges of bribery, four are upon the knowledge of the accuser, and specifically set forth the times, places, the amounts paid, and the persons who received them. These persons are Fred. Whiteside, the accuser, H. H. Garr, W. A. Clark and H. L. Meyers. It is not controverted that these persons were, as alleged, all members of the assembly at the times mentioned in the charges. The accuser was the senator from Flathead county, and H. H. Garr a representative from the same county. W. A. Clark and H. L. Meyers were the senators from Madison and Ravalli counties, respectively. The amount alleged to have been paid by the accused to each one for his vote for W. A. Clark of Butte for United States senator, is: To Whiteside, $5,000; to Garr, $5,000; to Clark, $10,000; and to Meyers, $10,000.

The charge of conspiracy to bribe is upon information and belief. It is alleged that the accused, by and through others with whom he had entered into an unlawful and malicious conspiracy to corruptly influence the official action of members of the Sixth Legislative Assembly, paid to many members thereof, whose names are unknown, large sums of money, by which they were induced to vote for W. A. Clark of Butte for United States senator. At the hearing, proof was admitted under all these charges, the Court first requiring the attorney general to furnish the accused a bill of particulars

containing specifications of names, amounts, times and places under the charge of conspiracy. We shall eliminate from this discussion all the charges based upon information, and address ourselves directly to the question of the guilt or innocence of the accused upon the specific charges of bribery. Furthermore, as the evidence is very voluminous and as, in our opinion, the order of disbarment must be made in case either one of these charges is sustained by the proof, we shall confine what we here say to the charge involving the payment of $10,000 to W. A. Clark, of Madison county. We shall refer to the cases of Garr, Whiteside and Meyers only in so far as it may be necessary to elucidate this one. The portions of the evidence bearing upon the financial transactions of Warner, Geiger and Hobson we have discarded as entirely immaterial. W. A. Clark was examined as to his dealing with Wellcome, and we give his testimony in full: "Q. What is your name? A. W. A. Clark. Q. How old are you, Mr. Clark? A. I am thirty-six past. Q. How long have you lived in Montana? A. About thirty-five years. Q. What is your business? A. I am an attorney at law. Q. Where do you reside and where do you practice your business or profession? A. In Madison county, Virginia City. Q. Were you a member of the sixth legislative assembly? A. I was. Q. A senator or representative? A. I was senator from Madison county. Q. Do you know Mr. Whiteside? A. I do. Q. Do you know Mr. Wellcome? A. I do. Q. Do you know Mr. Metlen, of Beaverhead county?' A. I do. Q. Do you know Mr. Paul, of Beaverhead county? A. I do. Q. State whether or not the last-named persons were members of the last legislative assembly. A. Mr. Metlen and Mr. Paul were members of the house of representatives. Q. Did you during your stay in Helena, in the performance of your duties as a member of the legislative assembly, have any conversation with Mr. Wellcome? A. I did. Q. Through whose invitation did you see Mr. Wellcome? A. Mr. Whiteside. Q. Can you tell us about the time you saw Mr. Wellcome? A. I think it was on the 4th

day of January of this year.  Q. Where did you see Mr.
Wellcome?  A. I saw him in room 207 of the Helena Hotel.
Q. Who accompanied you to the room?  A. Mr. Whiteside
accompanied me as far as the door.  Q. Had you been intro-
duced to Mr. Wellcome before that time?  A. I had known
Mr. Wellcome before that time.  I had known Mr. Wellcome
for two or three years.  I had met him professionally.  Q.
Upon going to the door, did you go into the room?  A. I
went into the room.  Q. Who were in the room at the time
you went in there?  A. When I stepped into the room, Mr.
Wellcome was there and Mr. A. J. Steele.  Q. How long did
you remain in the room?  A. I couldn't tell; probably ten or
fifteen minutes.  When I first stepped into the room, Mr.
Steele and Mr. Wellcome passed out of the entry door, and I
waited some little while before Mr. Wellcome returned, and I
do not know how long I was there.  Q. Upon the return of
Mr. Wellcome, did you have any conversation with him?
A. I did.  Q. I wish that you would detail to the court, as
explicitly as you can and with such circumstances as you can,
the whole conversation that you had with Mr. Wellcome
there.  A. Well, when Mr. Wellcome returned, I said to
him, 'Mr. Whiteside informed me that you wanted to see me.'
He said, 'Yes; I wanted to talk over the senatorial situation
with you.'  He sat down, and commenced to talk over mat-
ters, and he said, 'We want you in this fight with us, and we
want you hard.'  He says, 'We are going to win,—we are
going to get the votes; and if we don't get them one way, we
are going to get them another.'  He said, 'I want you to vote
for Mr. Clark.'  I said, 'What is there in it?'  He said,
'There is ten thousand dollars in it for you.'  I said, 'All
right.'  Mr. Wellcome then made the remark that he would
turn the money over to Mr. Whiteside.  I said that would be
satisfactory, and the conditions were as he stated them,—that
I was to vote for Mr. Clark for senator until they saw no
chance of an election, or until they instructed me not to, but
the money was to be turned over irrespective of Mr. Clark's
election, if I voted for him.  We then talked about the

matter— Q. Just interrupting you a moment to put a question. You went along in the narrative to the limit of testifying that Mr. Wellcome designated Whiteside, and asked you if he would be satisfactory? A. Yes, sir. Q. What did you say? A. I told him he would. He said he would get the money, and turn it over to Whiteside for me. I said I had no doubt but that he would do so, but I did not want to do business in that way; that I wanted to see the money turned over and counted, and then see Mr. Whiteside about it. Q. What did he say in reference to that? A. He said, 'We have not got the money now; we have pulled out all the big bills out of the Helena banks, but the old man [referring to Mr. Clark] will be over to-night with some currency, and I will see you then, and fix it up.' Q. What was said by you about that? A. I told him that was satisfactory. Q. Was that all the conversation you had? A. That was all the conversation I had. Q. When did you next see him? A. Somewhere about between nine and ten o'clock that evening. Q. Where did you see him then,—in what room? A. 201 at the Helena Hotel. Q. How did you happen to go to the Helena Hotel at that time? A. Mr. Whiteside told me that Mr. Wellcome wanted to see me, and took me to this room. Q. At what hour of the day was this,—about what time was this interview that you speak about? A. Some time between two or three or four o'clock; I could not say exactly. Q. The second was the same night? A. The second was the same evening, between nine and ten o'clock. Q. You went to room 201 on account of an invitation extended to you, if I understand you correctly, by Whiteside? A. Mr. Whiteside came after me, and said Mr. Wellcome wanted to see me, and took me to that room. Q. After you got to that room, whom did you find there? A. I found Mr. Wellcome there. Q. I wish you would detail now the conversation you had then, and who were in the room when the conversation was carried on. A. After I went into the room, Mr. Wellcome explained to me, and to Mr. Whiteside in my presence, the conditions about this money. Q. What were the conditions? What was this

explanation? A. It was to be turned over to Mr. Whiteside, to be delivered to me when I voted for W. A. Clark for United States senator until such time as they requested it, or until he was elected. Q. Then what took place? A. We sat, the three of us, in the middle of the room. Mr. Wellcome got up, and went over into that corner of the room (indicating), and made a remark about a picture hanging there,— about it being a fine engraving,—and said, 'Come over here; Dr. Campbell occupies that room.' There was a folding door, with curtains across at this end; and, when I went over in that corner, he pulled out an envelope out of his pocket, and laid it on the steam radiator, and he took the money out of the envelope, and counted it. It was not sealed at that time. He took out the bills, and there were ten one thousand dollar bills in it. Q. In respect to the points of the compass, what corner was it? A. The room being the same as this room, that corner (indicating) being the same as where the court sits, it was that corner. I am turned around in Helena as to the points of the compass, and I could not say. Q. It would be the southeast corner? A. I should judge it would be the southwest corner. Q. If you will, make a diagram showing the main street; that is, the street upon which the hotel fronts. (Witness complies.) Q. Now, which is the main street here? A. As I understand it, this is the street that the Helena Hotel is on. This is the front of the building (indicating), facing out this way (illustrating), this being the room to which I went with Mr. Whiteside, the room being about there (indicating). There was a small bath room about there, or something of that kind, and in this corner was where the money was handed to me, and here was the room designated to me as Mr. Campbell's room. Q. Go ahead now, and detail about the nature of the money. A. He laid the money down on the radiator, and said there was the money. I picked it up and counted it. The envelope contained ten one thousand dollar bills. I took the money, put it back in the envelope, sealed it, and wrote across one end of the envelope, 'The property of W. A. Clark, to be delivered to him under understood con-

ditions.' . I do not know whether it was 'under understood conditions' or not. It was understood to be. In addition to that, I took a pen and threw a blot of ink on the envelope as an additional identification. Q. Did you make any further marks on the envelope ? A. I wrote my initials on the flap. Q. I will ask you to look at that envelope, and state whether or not this was not the envelope which you had there. A. This is the envelope which I received from Mr. Wellcome, and the marks 'W. A. C.' on the back and this handwriting is mine. Q. What is this? A. That is the blot of ink which I threw on there from a fountain pen. Q. This is your handwriting? A. That is my handwriting on the top. (The envelope shown witness was Exhibit A.) Q. Now, after you did this with the envelope, what did you do with it? A. Mr. Wellcome and I walked over to the center of the room, and I handed it to Mr. Whiteside, in his presence. Q. Did any further conversation take place between yourself and Mr. Wellcome or Mr. Whiteside? A. Nothing, except Mr. Whiteside said he wanted to talk with Mr. Wellcome about some other legislators, and I took that as a dismissal, and I walked out and left them. Q. Did you have any other conversation with Mr. Wellcome? A. I did. I saw Mr. Wellcome— Well, I am getting along too fast. I am getting ahead of my story. I did have some conversation with Mr. Wellcome in a room. Q. What was said? A. He asked me to see Mr. Metlen and Mr. Paul, and see what I could do with them. Q. What did you say? A. I told him I would see them for him. Q. Did you at any time subsequent to that have a conversation again with Mr. Wellcome? A. The day the investigating committee was appointed, in the afternoon, I met Mr. Wellcome on Main street, down here about in front of the Western Union Telegraph office. He asked me at that time whether I had seen Mr. Metlen or Mr. Paul. I told him I did not, and I did not think anything could be done with them. Among other things, he said that perhaps he might fix it up by buying a lot of cattle from old man Metlen, as he expressed it. Q.

Mr. Clark, did you have any other conversation with Mr.
Wellcome after the conversation that you detailed that took
place on Main street? A. Yes sir. Q. Where? A. In the
senate chamber, on the morning that the report of the joint
committee was made,—just before the report. Q. Before or
after the report was made? A. Just before the report was
made. Q. What was the conversation that you had then?
A. Mr. Wellcome came to me in the senate chamber. I was
sitting by Mr. Norris' desk, and no one was near me, and he
says, 'I suppose you understand the plan that has been ar-
ranged.' I said, 'Yes sir; I think so.' He said, 'We have
arranged to have a number of our men vote for Mr. Conrad,
so as to avoid any suspicion.' (End of direct examination.)"

Cross-examination: "Q. What time did you say you first
went to Mr. Wellcome's room? A. I couldn't tell you the
exact time,—some time between two and four o'clock. Q.
You went there in company with Mr. Whiteside? A. As far
as the door with Whiteside. Q. You had some previous con-
versation with him about going to the room? A. Yes, sir.
Q. What was that conversation? A. Mr. Whiteside came to
me the morning of that day, or the evening before, and in-
formed me that the Clark people were using money to influ-
ence votes for United States senator; that he was trying to
arrange to expose them, and wanted me to assist him; and,
after thinking the matter over, I agreed to do it. Q. And
your going to the room was in pursuance of the plan you had
formed with Mr. Whiteside? A. Mr. Whiteside and I had
agreed upon that proposition. Q. The first suggestion made
to you was made to get you into this plan, was it not? A.
Yes, sir. Q. Was there any offer to influence your vote cor-
ruptly other than the offer to enter into this plan? A. Noth-
ing other than the offer Mr. Wellcome made me in this room.
Q. Prior to this time there had been no offer made to you by
anybody else? A. No, sir. Q. The offer made by Mr.
Whiteside was to procure evidence of the improper use of
money? A. Mr. Whiteside told me that the Clark people
had come out, and said that they were figuring on buying my

vote, because I got out and hurrahed for Clark. Q. It was pursuant to this arrangement that you went there? A. Yes, sir. Q. Who first talked to you about this? A. The first man that talked to me about this was Mr. Campbell. Q. Did Mr. Campbell understand fully your purpose in going to this room? A. He did. Mr. Campbell came to me, and talked the matter over with me. Q. Now, then, after seeing Mr. Wellcome in his room the first time, did you have any other meeting with Mr. Whiteside prior to your second? A. Not that I remember of, excepting that he came to me that evening, and told me that Mr. Wellcome wanted to see me, and took me to this room about which I have already testified,—to room 201. Q. Who took you to room 201? A. Mr. Whiteside. Q. Where was Mr. Wellcome at that time? A. He was in room 201. Q. Had you seen him at any other time during the day? A. Not excepting this conversation I have testified about. Q. What time of the evening was that? A. Some time between five and six o'clock. All I know was I was going out on the evening train on the Northern Pacific, down to the eastern part of the state. Q. Did Mr. Whiteside see this money that was placed into the envelope? A. I could not say whether he saw him place the money in the envelope or not. Q. Where was he at that time? A. He was near the center of the room. Q. Did you tell him what the envelope contained? A. I did. Q. What did you tell him? A. I told him it contained ten thousand dollars. Q. Did you tell him the denomination? A. No, sir; I did not; that is, I don't remember that I did. I might have, but I don't believe that I did. Q. Did you show him the money? A. No, sir; my back was turned to him. Mr. Wellcome was standing over here, and he laid the money down on the register, like that, and I stood here, and my back was turned to Mr. Whiteside at the time. Q. Where were you when you sealed the envelope? A. I was standing in this shape, right across the register, this way (indicating). Q. Where was Whiteside? A. As far as I know, near the center of the room. I left him there when I went over to

Mr. Wellcome. Q. Now, after receiving this money and giving it to Mr. Whiteside, what else was done by you in pursuance of this plan of exposing bribery? A. Not a thing. Q. 1 understood you to say that you had never been solicited by Mr. Wellcome to visit his room prior to the occasion that you went there? A. No, sir. Q. Had he ever had any conversation with you relative to the senatorial question? A. I don't think I ever talked with Mr. Wellcome about it prior to that time. Q. Then is it not a fact that this meeting at Wellcome's room was arranged for you by Mr. Whiteside, in pursuance of the plan which had been agreed upon between you and Mr. Whiteside? A. I think it was. Q. The plan, in the main, was that you were to go there, and to receive whatever offers of money were made, or, if none were made, to solicit them? A. The plan was that Mr. Whiteside came to me, and told me that the Clark people were figuring on buying my vote; that he wanted me to make arrangements to have me go to Mr. Wellcome, so that we could have proof of what they were doing; and, in accordance with that plan, I went to Mr. Wellcome's room, at Mr. Whiteside's request, on the day I have named. Q. It was in accordance with that plan that you asked Mr. Wellcome what there was in it if you voted for Mr. Clark? A. Yes, sir. Q. Whiteside did not tell you beforehand that he was authorized to offer you any money? A. Mr. Whiteside told me that they were figuring on buying me; that is all he said. Q. He made no offer, or pretense of offer, did he? A. I don't remember that he made any direct offer to me. Q. About this plan which you had previously agreed on, did it involve the payment of any money which might be offered you through Mr. Whiteside? A. The plan between Mr. Whiteside and myself was, I declined to hold the money, and the arrangement was to be that Mr. Wellcome was to turn the money over to Mr. Whiteside, to be delivered to me when I cast my vote in accordance with the agreement that Mr. Wellcome and I had made. Q. The previous plan agreed upon was that the deposit was to be made and put in Mr. Whiteside's hands? A. Yes, sir; for me.

Q. And did not this previous plan also involve an arrangement that, if any deposit of that character was made, it was afterwards to be presented by you and Whiteside before a committee of the legislature, to be thereafter appointed? A. I had nothing to do with that. I did not know anything about that. I don't know what Mr. Whiteside's plans were. Q. What were your plans relative to the exposure? A. I was simply to go there, and get the money from Mr. Wellcome, so that I would be able to swear before a court or anywhere else that he had offered me money for my vote. Q. It was contemplated that you were to testify to the facts that you desired to learn? A. It seems so, from the arrangement. Q. It was agreed upon between you that whatever facts you ascertained there you would testify to? A. I had no agreement to testify about anything or before anybody. Q. Now, there was a committee subsequently appointed, was there not? A. Yes, sir. Q. Do you remember when the committee was appointed? A. The day before the vote for senator was taken. Q. Monday afternoon? A. I don't know whether it was in the morning or the afternoon,— all I remember of it is that it was that day. Q. Didn't you say that you had no knowledge of the arrangement for the appointment of the committee before it was appointed? . A. I had not. Q. You had not discussed that with anybody? A. No, sir; I was not in the inside plans, if there were any. Q. Who else had charge of what you term the 'inside plans'? A. I don't know. The only conversation I had was with Mr. Whiteside and Mr. Campbell, that I have testified to. Q. You never had any further conversations with Mr. Campbell as to the perfection of the plans for the exposure, any further than the first conversation you had? A. No, sir; I think not. Q. After your transactions were taken up with Mr. Whiteside, you never renewed the discussion of the matter with Mr. Campbell? A. I informed Mr. Campbell about the payment of the money and turning it over to Mr. Whiteside, but I never discussed with Mr. Campbell any of the plans, if they had any. Q. Did you discuss with anybody, prior to being

called as a witness before the investigating committee, the facts about which you have here testified? A. I did not. Q. When were you called as a witness before the committee? It was—The notice was served upon me the afternoon of the day the committee was appointed. The committee was appointed in the forenoon or afternoon. I don't remember. Q. When did you appear before them? A. I appeared before them that evening. Q. About what hour? A. I should judge about 10 o'clock. Q. Who were present? A. The committee were present, Mr. Campbell, Mr. Meyers, Mr. Whiteside, and myself, and a number of other gentlemen, whose names I do not remember. Some of them were strangers to me. Q. Do you remember any others besides those you have named? A. It seems to me that Mr. Walkup was there; I would not be positive. There were three or four gentlemen that I did not know. Q. Who is Mr. Walkup? A. Some gentleman from Anaconda. Q. Do you know Mr. Tuohy? A. Yes, sir. Q. Was he present? A. I don't know whether he was or not; I don't remember. Q. Do you know Mr. Harrity? A. Yes, sir. Q. Was he present? A. He was there, I remember now, since you call the name; but I can't remember people's names. Q. Who was Mr. Harrity? A. I don't know. Q. Do you know what relation he had to the senatorial controversy? A. I do not. Q. You don't know now what relation he had? A. No, sir. Q. Do you know where he lives? A. I do not. Q. Or what his employment is? A. I do not. I do not remember ever seeing him, until I saw him to-day on the street down here, since that time. Q. Had you never seen him previous to that time? A. Not that I remember of. Q. Don't you know that he came Monday night—the night of the investigating committee—in charge of Fred. Whiteside? A. I do not. Q. Did you see him with him? A. No, sir; except in the meeting where the committee met; he was there. Q. Where were you when Mr. Whiteside came to that committee room? A. I was in the room. Q. Who came with him? A. I couldn't tell you. Q. Who went away with him? A. I couldn't tell you that.

Q. Did you see Mr. Whiteside when he returned to the legislative hall on Tuesday morning? A. No, sir; I don't remember whether I did or not. Q. How long have you known Mr. Whiteside? A. I have known him since the session of the legislature two years ago. Q. How frequently between the session of two years ago and the opening of the session of last year had you seen him? A. I don't believe that— I don't recall of ever having seen him. I might have met him some place in the state. Q. You had no relation of any kind whatever between that time with him? A. No, sir. Q. And prior to that time you had no business relations with him? A. No, sir; none at all. Q. Your acquaintanceship simply covers the period of the legislative session of two years ago? A. Yes, sir; the last session and two years ago. Q. In that session of two years ago Mr. Whiteside took quite a prominent part in some investigation pending there, did he not? A. I so understood that he did. Q. Did you understand the purpose Mr. Whiteside had in his plans relative to the bribery investigation of this last legislature? A. Only what Mr. Whiteside and Mr. Campbell had told me their object was,—to detect Mr. Clark or anybody else that was using money for senatorial purposes. Q. Did you at the time Mr. Whiteside first presented the question to you consider that Mr. Whiteside was a reliable man? A. When Mr. Campbell first presented the question to me I objected to having anything to do with it until the whole condition of affairs was explained. I did not consider, from what I had seen, that Mr. Whiteside was reliable at that time; for at that time I did not understand, nor was it explained to me fully, what he might do. Q. You at one time entertained the idea that Mr. Whiteside was a scoundrel? A. No, sir; I did not. Q. Did you not testify before the grand jury in this city that was held on or about March 15, 1897? A. Yes, sir. Q. And did you not tell the grand jury that, in your opinion, Whiteside was a scoundrel, that the man was a scoundrel, and that his whole proceeding was rotten? A. I did not use that language. I used some very strong language in regard to the

last investigating committee, but I did not use that language.
Q. That was the investigating committee in which Mr. White-
side was a minority member, and presented a minority report?
A. I believe it was.   Q. Did you not characterize his minor-
ity report as false and fabricated by him or by somebody
else?   A. I don't think I carried it that far.   I think the
purport of my testimony before the grand jury was to the
effect that I was unable to understand the minority report, in
view of the fact— I was acting as attorney for the capitol
commission, and I asked Mr. Whiteside if he had anything
further to present, and he said he didn't, and from that I con-
veyed the impression to the grand jury that I doubted his
motive, and I did.   Q. He withheld matters from that com-
mittee until after the legislature had adjourned?   A. It so
appeared from the report.   Q. And nothing had occurred in
the meanwhile to change your views of the man?   A. No,
sir.   (End of cross-examination.)''

Redirect examination:   ''Q. You do not pretend to say
now, do you, Mr. Clark, that he was incorrect in the state-
ments that he made in respect of the capitol commission?   A.
From information that has come to me since that time, I think
he was right.   Q. So that if you did entertain the opinion at
one time that he was a scoundrel, and with the information
that you now have you think he was right, then your judg-
ment about him was wrong, was it not?   A. Yes, sir.   Q.
Do you know anything about a suit being brought against
him by members of the capitol commission for defamation of
character, caused by the publication of that report?   A. Only
by hearsay.   Q. That was the only reason that you thought
that he was actuated by scoundrelly motives,—because he
said that he had nothing else to communicate, and subse-
quently presented the minority report?   A. Yes, sir.   Q.
And, at the time that Mr. Campbell approached you concern-
ing the briberies generally practiced at this last legislative
session, you were then in the possession of information
respecting the correctness or incorrectness of the charges that
were made by Mr. Whiteside in his minority report?   A.

When Mr. Campbell broached the matter to me, I told him I would not have anything to do with Mr. Whiteside, until this matter had been cleared. I called his attention to the minority report, and then this matter was explained to me from beginning to end, and I changed my views of Mr. Whiteside. Q. And, if you did at one time entertain that opinion that he was a scoundrel, you do not entertain that opinion now? A. No, sir. Q. Your change of opinion is consequent upon an investigation of these facts? A. Yes, sir; as far as I could ascertain in my subsequent experience with him in this connection and in this bribery business."

Recross-examination: "Q. Your investigation of the facts simply consisted in a statement of the pertinent facts by Mr. Campbell, who is Mr. Whiteside's attorney? A. Yes, sir; I relied upon Mr. Campbell's statement. I always found him honorable."

The only other witness who testified to the facts of this transaction was Fred Whiteside. His examination consumed the better part of two and one-half days. He frankly states that he came to Helena about the 31st of December, 1898, with the intention to expose those guilty of corrupt practices in connection with the approaching election of United States senator; it having already come to his ears that money was being used corruptly to influence members of the assembly in casting their votes. Upon learning that Wellcome, the accused, was managing the campaign of W. A. Clark, of Butte, he at once sought acquaintance with him, with the intention of gaining his confidence and, if he found him engaged in corrupt practices to expose him and others who were also guilty. By the 1st or 2nd of January this acquaintance had become sufficiently intimate to induce the accused to arrange with Whiteside to pay to the latter the sum of $10,000 for his vote and for his aid in securing others by similar means. To this end Whiteside saw State Senators Meyers and Clark and Representative Garr. Meyers and Clark were induced to go into his scheme of exposure, to pretend to barter their votes for $10,000 each, and turn the money over to Whiteside, so that

they would be able, as witnesses, to establish the bribery. Garr, who had already been tampered with by Wellcome, was not cognizant of this plan, but it was sought by Whiteside to get the $5,000 intended for Garr into his (Whiteside's) hands, so as to betray him also.    In pursuance of this plan, he brought Clark and Wellcome together at room 207 at the Helena Hotel, where the arrangement for Clark's vote was made, as Clark states.    The story of this transaction is repeated by Whiteside in all substantial particulars as it is told by Clark.    The deal was consummated on the evening of January 4th, at room 201 at the Helena Hotel, and the sealed envelope containing the money marked for identification, as stated by Clark, remained in Whiteside's possession until turned over on January 9th to the joint committee of the two houses sitting to investigate charges of bribery.    In the meantime, and until the meeting of the committee, negotiations were going on for the vote of Meyers.    This was finally arranged for on the 6th or 7th of January.    On one of these days Meyers and Whiteside went to room 206, or an adjoining room, at the Helena Hotel.    Whiteside went to Wellcome's room to bring Wellcome to pay over the money, but, finding him occupied, he received the money, $10,000, and returned with it to the room where Meyers was.    There it was counted, sealed up, marked for identification, and turned over to Whiteside for safe-keeping.    This was opened by the investigating committee.

While these negotiations were going on, Whiteside also approached Garr.    Finding out from him that he had arranged to vote for W. A. Clark for $5,000, and had the money deposited with one A. J. Steele, but was dissatisfied with the arrangement, he set about persuading Garr to have this money also placed in his hands.    He finally succeeded in getting the money returned to Wellcome by Steele, and then turned over to himself by Whiteside.    This was done on January the 8th or 9th, at Wellcome's room at the hotel.    Garr was not present, but, going in search of Garr, Whiteside found him, went with him to another room, and then Garr wrote his

initials upon the envelope containing the money. This was likewise turned over to the committee on the 9th. At this time he (Whiteside) also obtained from Wellcome $5,000 in part payment of the sum promised him for his vote. This was also sealed up, and turned over to the committee. The bills in each package were $1,000 bills, except the Meyers package, which contained $10,000 in bills of different denominations, including six $1,000 bills. The packages were all marked with the initials of the respective parties for whom they were held, the Clark package being marked, as stated by Clark, in Wellcome's presence at the time it was delivered. The envelopes were introduced in evidence as exhibits to Whiteside's statement. This is the substance of Whiteside's testimony about the origin of the $30,000 turned over to the committee by him. Garr did not testify. Meyers was sworn as a witness, and corroborates the statement of Whiteside as to the occurrence in the room when the contents of the package intended for Meyers were counted and sealed up.

After accounting for the custody of these packages from the time they were turned over to the committee, by showing that they were opened, and then delivered, otherwise intact, to the state treasurer, the attorney general had the treasurer sworn, to identify the bills in each package by number and denomination. They were then introduced in evidence.

The accused was not sworn as a witness, but was present throughout the hearing. At the time appointed by this court for the accused to answer the charges, he did not appear in person. His answer was made under the oath, upon information and belief, of one of his counsel. Thus, the charges themselves are not challenged by any direct denial by him. The statements of Clark and Whiteside are not contradicted by any one. The accused is the only person, except Garr and Steele, in relation to the Garr matter, who could deny them, or otherwise enlighten the court concerning them; for it appears from the evidence of these witnesses that not more than one person was present with the accused at any of the negotiations, except in the one instance when Clark was paid the $10,000 at room 201 of the Helena Hotel.

In the formal charges it is alleged that Wellcome was active in the support of W. A. Clark, of Butte, for United States senator.   This is admitted.   It may be further noted that in his testimony Whiteside details several conversations with Wellcome as to Wellcome's negotiations with many other members of the assembly whose votes he was trying to secure by the use of money and otherwise.   The same remark may be made touching the testimony of Clark.   Another circumstance, somewhat corroborative of the stories of Clark and Whiteside, in view of the conversation first had by Clark with Wellcome as to the intention of certain supporters of W. A. Clark, of Butte, is the fact that, when the election did finally take place, many Democrats and Republicans, who theretofore had opposed Clark's candidacy, shifted over and voted for him, without apparent cause.   Steele was not called as a witness.   Clark and Whiteside, prior to their examination in this court, had twice been examined touching these transactions,—once before the legislative committee, and once before a grand jury called by one of the judges of the First district to inquire into the charges made before the committee.   Their statements made on both these occasions were in the hands of counsel at the hearing.   And though both were thoroughly cross-examined by able and astute questioners, and every opportunity was afforded to test their truthfulness by a comparison of these statements, no substantial discrepancies were shown.   A careful and painstaking examination of their accounts given at the hearing, in so far as they relate to the same matters, also fails to reveal any substantial contradiction or omission.   These statements are not unreasonable, in the light of this whole record, and it is highly improbable that such a story could be deliberately concocted and repeated so many times without being discredited in some substantial particular.   After seeing and hearing the witnesses ourselves, and noting the silence of the accused when he ought to speak, and his failure to produce other witnesses to rebut material statements made by Clark and Whiteside, which it was in his power to do, we can reach no other reasonable conclusion than that this charge is true.

2.   Having reached this conclusion, nothing would be left to do but to direct the order of disbarment to be entered, were it not that we feel it our duty to notice briefly the principal reasons presented by counsel why this order should not be made.

It is urged by counsel that the failure on the part of the accused to be sworn in his own-behalf may not be used to his prejudice.   Counsel say that this is, to all intents and purposes, a criminal investigation, and that the rule laid down on this subject in Section 2442 of the Penal Code should be applied.   The answer to this is that "this is not a criminal prosecution, nor an aid to a criminal investigation, but is to ascertain if the accused is worthy of the confidence, and is possessed of that good moral character, which is a condition precedent to the privilege of practicing law and continuing in the practice thereof." (*In re Wellcome*, 23 Mont. 213, 58 Pac. 47.)   This is a special proceeding of a civil nature, and the rules applicable to criminal cases do not apply. (*In re Wellcome*, 23 Mont. 259, 58 Pac. 711; *In re Randel*, 158 N. Y. 216, 52 N. E. 1106.)   If the accused is not guilty, nothing would have been easier than for him to deny all knowledge of the charges laid at his door.   His having failed to testify in his own defense, when he should do so, and deny the statements of Whiteside and Clark, not only justifies, but irresistibly impels, this court, upon the evidence before it,- which is credible, to the conclusion that he is guilty.

Certainly, the accused is presumed to be innocent until the contrary appears, but in this kind of proceeding this presumption remains with him only until it appears to the Court with reasonable certainty that he is guilty. (*State ex rel. Stapleton* v. *Wines and Booth*, 21 Mont. 464, 54 Pac. 562.)   When this is made to appear, then it is incumbent upon him to speak.

These remarks also dispose of the contention of counsel that the Court must be satisfied of the truth of the charges beyond a reasonable doubt.   This rule applies only to criminal cases as such.   The rule of *State ex rel. Stapleton* v. *Wines and*

*Booth, supra*, is the one applicable here. But, even if the rule contended for should be applied, we are of the opinion that the proof in this record, as heard by us from the witnesses themselves, and tested by the ordinary rules of weighing evidence, is sufficient to satisfy any impartial, fair-minded person, beyond a reasonable doubt, that the accused paid W. A. Clark, of Madison county, $10,000 for his vote.

Counsel also contend that the witnesses Whiteside and Clark are not worthy of belief, because six men from the respective neighborhoods where they live swore that each of them bears a bad reputation there for truth, honesty and integrity. That these witnesses did so swear is true. The six witnesses by whom it was sought to impeach Whiteside swore that they would not believe him on oath. Those called to impeach Clark did not say that they would not believe him on oath. An analysis of the testimony of the witnesses who testified as to the reputation of Whiteside shows that most of them were the staunch advocates of the candidacy of W. A. Clark for the senate, and political enemies of Whiteside. Some of them had had differences with him about money matters, and at least one stated that he had had a good opinion of Whiteside until he had made the charges of corruption against W. A. Clark, of Butte, and his friends. This witness admitted that he had loaned considerable sums of money to Whiteside without any security up to the time of the election in 1898, and that he had voted for Whiteside at that election. It further appeared that Whiteside was declared the successful candidate at that election, though he was afterwards deprived of his seat upon a contest in the state senate, wherein his opponent was declared elected by less than a dozen majority.

The result of the attempt to impeach Clark tended to show that he is by nature an avaricious man, and no more. This testimony also came from persons evidently made unfriendly by litigation in which Clark was the attorney for the adverse party, or by differences arising out of his professional relations to them. Moreover, it appears that a majority of the

people in Madison county had sufficient confidence in him to elect him to the state senate from that county. Neighbors and acquaintances testified to the good reputation of both Whiteside and Clark for truth.

But the most convincing proof of the truth of their testimony is their manner and behavior under examination, and the manifest impossibility that they could concoct such a story, involving so much detail and so many incidents, and repeat it three different times, without betraying their falsehood. Again, it does not appear that either of these men, or both together, could in any way command large sums of money. No attempt was made to show this. The record tends to prove that Whiteside is a man of small means. Yet the money—$30,000, all in $1,000 bills, except $4,000 of the Meyers package—is in the hands of the state treasurer as a result of the exposure,—a significant fact to be explained or accounted for on no other theory of the proof in this record than that it came from the hands of the accused. And this brings us to the consideration of another feature of the defense.

Counsel for the accused at the opening of their proof proposed to show that for many years there has been a schism in the democratic party in this state; that one division is favorable to W. A. Clark, of Butte, and the other follows the leadership of one Marcus Daly, and is known as the "Daly gang;" that the effort of the latter has always been to rule the party at all hazards; that one of its purposes has been to defeat W. A. Clark, by fair or foul means, in his aspirations to go to the senate of the United States; that the witnesses Whiteside and Clark belong to this "gang;" that the exposure was the result of a criminal conspiracy among various members of this "gang," including Clark, Whiteside and Meyers, falsely to charge W. A. Clark, of Butte, and his friends, with bribery, and thus defeat him; and that the money turned over by Whiteside was really furnished by that faction to give the color of truth to the charges made against Wellcome. Evidence was introduced by the accused in sup-

port of this defense. But taking this all together, and giving it the utmost weight to which it is entitled, it is hardly sufficient to require consideration, as it establishes nothing beyond the fact that there is and has been for some years a strong political hostility between W. A. Clark, of Butte, and Daly, as rivals for leadership in the democratic party. There is no fact proved from which an inference is permissible, upon any legal principle, that the opposition from the Daly faction of the party was other than such as was perfectly lawful. It was certainly no crime for any number of men to combine together to elect W. A. Clark, of Butte, by lawful means, to the United States senate. It was certainly equally lawful for any number of men to join forces to defeat him, if they used lawful means only. It does not appear in this record that the opponents of Clark used any unlawful means in their opposition to him; nor is there a scintilla of proof tending to show that any of them furnished the money in evidence in this case.

It appears from the proof that the accused has heretofore borne an excellent reputation for honesty and integrity in his profession. This fact we have considered in his favor. But a spotless reputation is no defense for a crime, where the proof establishes it as a fact. So, in this proceeding, being satisfied, from all the evidence that the accused is guilty notwithstanding his previous good character, we must so find. (*People* v. *Betts* (Colo. Sup.) 58 Pac. 1091.)

Finally, counsel insist that men who deliberately deceive another in order to win his confidence with a purpose to betray him are not worthy of belief, and that an attorney, heretofore above reproach, should not be degraded from his profession upon the testimony of men in the position of Whiteside, Clark and Meyers. Courts always act cautiously upon such evidence. Many of them condemn such action in the severest terms. We ourselves agree that the course pursued by these persons is to be censured. Far better and more righteous would it have been for Clark and Meyers, who are members of the bar of this Court, to have gone to Wellcome, their brother lawyer, and, if possible, persuaded him to desist from the abhorrent practices he was engaged in; far more

in accord with those sentiments of professional honor and integrity which high minded lawyers should always possess to have recalled him to a sense of duty to the law and not to have deceived him and encouraged him to commit crime. But, however reprehensible it may be as violative of the principles of propriety and morality, the fact that a witness has acted as a detective or decoy, apparently entering into the criminal plan in order to detect and expose it, does not, of itself, render his evidence unworthy of belief. The adjudicated cases are numerous where convictions upon this character of evidence have been sustained. (8 Am. & Eng. Enc. Law (2d Ed.) 295; *State* v. *Stickney*, 53 Kan. 308, 36 Pac. 714; *People* v. *Noelke*, 94 N. Y. 137; *Grimm* v. *U. S.*, 156 U. S. 604, 15 Sup. Ct. 470, 39 L. Ed. 550; *Rater* v. *State*, 49 Ind. 507; *U. S.* v. *Slenker*, (D. C.) 32 Fed. 691; *State* v. *Jansen*, 22 Kan. 498; *U. S.* v. *Moore* (D. C.) 19 Fed. 39; 3 Rice, Ev. 522, 523.)

The fact that the act here charged as a ground for this proceeding had no connection with the professional conduct of the accused makes no difference as to the treatment to be given it by this court. Under our statute, as heretofore construed in this case (*ante* p. 140, 58 Pac. 45), offenses within the line of professional duties, and those without these lines, stand upon the same footing, so far as concerns the quantum of proof necessary to establish them. Nor does it matter that no injured suitor is demanding redress. With the motives prompting this action on the part of the accuser we have nothing to do, further than as they reflect upon the credibility of his story. The ultimate end sought by him may be very far from an honest purpose to purge the profession of an unworthy member. Still, when a charge of this kind is presented, and the proof is made showing that a member of the profession has been guilty of acts tending to subvert the very foundations of society, the Court must act, painful to us as the performance of the duty in this case is, be the ultimate consequences what they may.

It is therefore ordered that John B. Wellcome be removed from his office of attorney and counselor of this Court, and that his name be stricken from the roll.