MR. JUSTICE HARRISON
dissenting:
While I recognize the difficulty of the task force before this Court and while I fully acknowledge the integrity of my brothers in meeting the challenge here presented, I respectfully dissent.
“There is no profession, in which moral character is so soon fixed, as in that of the law; there is none in which it is subjected to severer scrutiny by the public. It is well, that it is so. The things we hold dearest on earth, — our fortunes, reputations, domestic peace, the future of those dearest to us, nay, our liberty and life itself, we *559 confide to the integrity of our legal counsellors and advocates. Their character must be not only without a strain, but without suspicion.” Emphasis added.)
G. Sharswood, Essays on Professional Ethics (1854), reprinted in Selected Readings on the Legal Profession, assembled by a committee of the Association of American Law Schools (1962).
Disciplinary proceedings inevitably bring to mind the oft-quoted words of Justice .Cardozo:
“. . . Many forms of conduct permissible in a workday world for those acting at arm’s length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the ‘disintegrating erosion’ of particular exceptions. [Citation omitted.] Only thus has the level of conduct for fiduciaries been kept at a level higher than the trodden by the crowd. It will not consciously be lowered by any judgment of this court.” Meinhard v. Salmon (1928), 249 N.Y. 458, 164 N.E. 545, 546.
As has been noted often enough, this language is cited when the boom is lowered on the offending fiduciary — and let us not forget that, by definition, an attorney is a fiduciary — but is conspicuously absent when the offense is deemed absent, too. Nonetheless, this is the standard which shines as our polestar and guides us through the moral morasses, which disciplinary proceedings inevitably become.
The majority opinion recites and adopts the factual findings of the Commission on Practice. I have no quarrel with the adoption of the findings, and the majority opinion is well done in this respect. But after wholeheartedly concurring in the findings, the majority then discards the recommendation of disbarment made by that same Commission. With this rejection of the recommendation of disbarment I take exception.
*560 It long been recognized that there is a great reluctance on the part of courts to impose discipline.
“This . . .■ is understandable. It is in these proceedings that the human side of the judge appears most strikingly. Judges are lawyers. Many of them have recently been practicing at the bar. They know something of the temptations from which they have been removed by elevation to the bench. They have maintained friendships, social and sometimes political, with many practicing lawyers. It is a painful task to sit. in judgment upon the conduct on one’s friends. Theirs is the final word. The grievance committee proposes, but the court must dispose. Its duty is, therefore, the most unpleasant to perform.
“Moreover, there seems to persist a strange confusion as to the nature of disciplinary proceedings. Over and over the courts have stated that the end and purpose of such proceedings, particularly where disbarment is under consideration, is not punishment of the offender, but protection of the public. Yet somehow the idea of punishment creeps in.” McCracken, The Maintenance of Professional Standards-, Duty and Obligation of the Courts, 29 S.Cal.L.Rev. 65, 73 (1955).
This Court hás repeatedly confirmed the principle that discipline of a wayward attorney is for the protection of the public. In In re Peters (1925), 73 Mont. 284, 288, 235 P. 722, 774, for example, we stated:
“The purposes of removal of an attorney are to purge the profession of those who lower its high standards and bring an honorable calling into disrepute and contempt, and to protect the public at large, and the courts, from the acts of the unscrupulous. As was said in Re Thresher, 33 Mont. 441, 84 P. 876, 114 Am.St.Rep. 834, 18 Ann.Cas. 845: “This proceeding is in no sense a criminal prosecution, nor is it in aid of a criminal investigation. Its purpose is to ascertain whether the accused is worthy of confidence and possessed of that good moral character which is a condition precedent to the privilege of practicing law and of continuing the practice thereof. * * * ‘“The end to be attained is not punishment, but protection.”
*561 Repeatedly it has been said that, by admitting an attorney to practice, a court endorses him to the public as worthy of their confidence in professional matters, and if he becomes unworthy, it is the duty of the court to withdraw the endorsement. We have committed ourselves to this: “‘[T]here is no duty imposed upon a court more important than that of preserving to the best of its power and ability, the professional integrity and purity of its bar.’ ” (Emphasis added.) In re Young (1926), 77 Mont. 332, 347, 250 P. 957, 962. There, too, we said:
‘“The position of an attorney and counselor at law is that of an officer of the court. His relation to the court, the bar, and the public is one of trust and confidence. To his integrity and ability are not infrequently intrusted the lives, the liberty, and property of the citizen. Years of time, arduous labor, and constant application are required to elevate him to that professional standing which enables him to discharge with fidelity the responsible duties intrusted to his care. If dishonest practices and unprofessional conduct have caused him to forget his obligations, and lead him to a violation of the sacred trust, his name should be stricken from the roll, and he should be removed from a place in the ranks of the profession which he is found unworthy to fill.’ (In re Catron, 8 N.M. 253, 43 P. 724.)” 77 Mont. at 347-48, 250 P. at 962.
With regard to disbarment, intended to protect the public, Mc-Cracken offers these noteworthy observations:
“Herein lies the essential foundation upon which rests the entire structure of the bar. In no other field, save perhaps that of the clergy, does a man bear so powerful an endorsement when he enters into the practice of his vocation. The court, undoubtedly the most respected official body in American life, has carefully examined into this man’s character and is prepared to advise the public that he is worthy of confidence. His clients rely upon that endorsement, consciously or unconsciously. So does the bar; so do the courts themselves. If he proves himself unworthy of this confidence, there is only one thing to do — that is revoke his license. The practice of the law is a privilege, and while it has been said that privilege may *562 ripen into a property right, it is nevertheless a right which is held in sufferance. It may be lost by misuse.” 29 S.Cal.L.Rev. at 75.
Although “[p]rojection of the public, and nothing else, lies at the basis of [disbarment]” and although “this doctrine is the sole justification for discipline of a lawyer for actions other than contempt of court,”
“[t]his philosophy has not always been followed. Indeed, the leniency of courts, even in the face of well-supported recommendations by the examining committee or board, has become almost proverbial.” 29 S.Cal.L.Rev. at 75.
This Court should not aid in the making of such a proverb, especially in the face of a well supported recommendation such as that made by the Commission in this matter.
McCracken quotes this penetrating observation:
“‘The recommendations of the Board of Governors [a body similar to Montana’s Commission on Practice] represents the judgment of an experienced body of representative lawyers, familiar from daily contact with the conditions of practice and the standards of conduct currently prevailing at the bar. Judges of the Supreme Court, separated from practice by long terms not only in their own court but often in courts below, cannot possibly have the same intuitive judgment as to degrees of misconduct, or know so well the critical reaction of the bar, or of public opinion. Such judges are not likely to be able so well to discern in the particular dereliction a reflection of some general evil; nor are they so competent to estimate the effect of a particular penalty either on the individual attorney accused of as a check upon the more general evil, when such evil exists.’” 29 S.Cal.L.Rev. at 76.
The reasons advanced above are sufficient to commend this Court to follow the recommendations made by the Commission in the matter before us.
I believe that the majority opinion fails to give credit where credit is due. The Commission attorneys who investigated this matter spent many trying hours in pursuit of the truth of the allegations and charges, and doubtless spent much time fashioning a rec *563 ommendation which would fairly comport with the findings. I would defer to the recommendations of the Commission, in the absence of egregious error unsupported by the record, much as Court defers to the district courts in the absence of manifest error. The majority acknowledges that as well, for it proclaims reluctance to reverse the decision of the Commission, “which is in a better position to evaluate conflicting statements after observing the demeanor of the witnesses and the character of their testimony.” It is precisely because that is the best possible reason for relying on the Commission’s recommendation that I would adopt it and disbar appellant Goldman.
The’following observation is meet:
“Every representative of a grievance committee or examining board who has appeared more than once before a court with a recommendation for disbarment has had the experience of finding the court in a hostile frame of mind and inclined to impose upon him the burden of persuading it. Of course, that should not be the case. When a group of members of the bar has performed the painful duty, often at great sacrifice to themselves, it would seem that the court would be in frame of mind to accept their recommendations unless persuaded otherwise by the offending lawyer. Curiously enough, more frequently than not, this is not the attitude of the court. Rather, it appears to assume the attitude that a man is being persecuted by his fellow lawyers and that he needs the court’s assistance and protection.” 29 S.Cal.L.Rev. at 77.
Again, it is the public which is in need of protection, and it is the court which ultimately provides the protection in policing those who are its officers. Yes, it would seem that a court would be in a frame of mind to accept the recommendations made by the members of the bar who have performed a painful duty. This Court should accept the recommendation of disbarment, for appellant Goldman has not persuaded it to do otherwise.
As a prelude to the Canons of Professional Ethics, which govern the conduct of all attorneys admitted to practice in this state, we have said:
*564 “The Supreme Court of Montana recognizes that the stability of courts and of all departments of government rests upon the approval of the people. The future of those engaged in the practice of law depends upon the maintenance of absolute confidence in the integrity of the Bar and the efficient and impartial administration of justice. This cannot be accomplished unless the conduct and motives of lawyers are such as to merit the approval of all just men.”
These remarks mesh with the policy that disbarment of an errant attorney is for the protection of the public. Unless we keep clean our own house — and “[i]f the house is to be cleaned, it is for those who occupy and govern it, rather than for strangers, to do the noisome work,” People ex rel. Karlin v. Culkin (1928), 248 N.Y. 465, 162 N.E. 487, 493 (Cardozo, C. J.) — we cannot expect the public to have confidence in the integrity of the bar and in our system of justice.
“The attitude of the public toward the [legal] profession is not friendly[.]” L. R. Patterson and E. E. Cheatham, The Profession of Law 50 (1971). That understatement is underscored by D. Melinkoff in The Conscience of a Lawyer 15 (1973): “[T]he mystery is not that people hate lawyers', but that there are any left to hate.”
All attorneys are bound by Canon 9 of the Code of Professional Responsibility,, which mandates that “a lawyer should avoid even the appearance of impropriety.” The first ethical consideration articulated by the American Bar Association in conjunction with this canon urges lawyers to promote confidence in our legal system and in the profession so the public may have faith that justice can be obtained within our government of laws. Again, we hear the theme of the public good, of protecting the public and the system which all lawyers have sworn to serve as persons of integrity and good moral character. It has been said time and time again; one court has phrased it thus:
“No matter how learned in the law a man may be, nor how skillful he might be in the conduct of suits at law, or equity, he can never be admitted to the bar until he can satisfy the court that he possesses that first requisite to admission to the bar, a good moral *565 character. Such character he must have when he knocks at the door of the profession for admission, and such character he must have while enjoying the privilege and right to remain within the fold. When he ceases to be a man of good repute, he forfeits his right to continue as a member of the bar.” (Emphasis in original.) Ex parte Thompson (1933), 228 Ala. 113. 124, 152 So. 229, 238, 107 A.L.R. 671, 684.
The majority opinion recites that the members of the Commission, having observed the witnesses on the stand, reached conclusions which are not erroneous, much less clearly erroneous. It is acknowledged and affirmed by the majority that the Commission found against appellant Goldman, that the Commission, in judging the credibility of Goldman, found against him. As the majority itself states, simply because Goldman denied the charges made against him is no basis on which to set aside the findings of the Commission. Our judgment, says the Court, is that the Commission is supported by all the facts and circumstances in this case. With this, I thoroughly agree.
The majority firmly opines that the members of the Commission decided the matter “fairly and impartially, based upon the evidence they received.” I join in that assessment. It is clear that the members performed a difficult task with the utmost integrity, with fairness of mind and with decency and sensitivity. Their findings have been accepted by this Court; logic dictates that their recommendation cannot thereafter be disregarded.
The Court expresses concern for the “tainted” evidence of Dr. Hogan; yet the Court accepts in toto the findings of the Commission, whose members observed the demeanor of both Hogan and Goldman and chose to find against Goldman. The majority expresses concern that other persons involved in disciplinary proceedings arising out of the Workers’ Compensation investigation have not been visited with disbarment; but it must be remembered that each case is decided individually, and properly so. Surely it is illogical and unjust and contrary to our principles of fair play to proclaim that because others have been disbarred, the one more *566 lately before the court, deserving or not, should be disbarred because the others were; it is quite as illogical and unjust and contrary to say that because no one else has been disbarred, a person who merits disbarment should not be disbarred. Each case is different; each must be decided on its own unique facts. The facts of this case dictate that the Commission’s recommendation be adopted and enforced by this Court. As in State ex rel. Hartman v. Cadwell (1895), 16 Mont. 119, 133, 40 P. 176, 181.
“[t]he question presented by this proceeding is not whether the respondent is guilty of a crime of which he has been or ought to be convicted, but whether, under all the facts of the case, he is a fit person to be permitted to practice as an attorney and counselor at law in this state.”
The majority opinion expresses concern about “the abortive and controversial handling of the Workers’ Compensation investigation itself”. Intending no disrespect, I submit that the handling of that investigation has no relevance to this, a disciplinary proceeding of a member of the state bar.
Again, with no disrespect, I take exception to the concern for the lack of revelation of dishonesty between the attorney and his clients. There is ample evidence of dishonesty elsewhere in Goldman’s dealings in his capacity as an attorney. I repeat, with due credit to Mr. Chief Justice Sands, if a lawyer is not an honest man, he will not be an honest attorney, and honesty is an essential qualification for admission to and remaining in the bar. The bar, indeed the system of justice, cannot afford to have dishonest men practice under its banner, and the public is entitled to insurance that dishonest men are not knowingly, under sanction of the bar and with the apparent blessing of this Court, permitted to prey upon it. In re Hansen (1936), 101 Mont. 490, 503, 54 P.2d 882, 888 (Sands, C. J., dissenting).
Finally, the majority opinion notes that the attorney has no previous record of disciplinary action taken against him. We have heard such arguments before and have dismissed the, “[A] spotless reputation is no defense for [an offense], where the proof establishes *567 it as a fact.” In re Wellcome (1899), 23 Mont. 450, 471, 59 P. 445, 453. Notwithstanding a clean record, if the evidence points to professional violations, as it does in this case, then the findings must comport with the evidence. As a defense, a lack of a prior record here cannot withstand the overwhelming evidence of professional impropriety on the part of Joseph Goldman. This Court has always adhered to the dictum that a condition precedent to the privilege of practicing law and of continuing in the practice is possession of good moral character such that the practitioner is worthy of confidence placed in him by the public and by the courts and their officers. “A character for honesty and integrity is as necessary, to justify his retention of the privilege after he has acquired it, as it was to acquire it in the first place; and when his conduct is such that he has forfeited his right to the confidence of the public, he has forfeited his right to the privilege also.” In re O’Keefe (1918), 55 Mont. 200, 204, 175 P.593, 594.
When it becomes evident that one enjoying the privilege of practicing law is unworthy of that confidence and no longer possesses that good moral character, it is the duty of this Court to remove that individual.
“[I]t has been well settled, by the rules and practice of common-law courts, that it rests exclusively with the court to determine who is qualified to become one of its officers, as an attorney and counsellor, and for what cause he ought to be removed. The power, however, is not an arbitrary and despotic one, to be exercised at the pleasure of the court, or from passion, prejudice, or personal hostility; but it is the duty of the court to exercise and regulate it by a sound and just judicial discretion, whereby the rights and independence of the bar may be as scrupulously guarded and maintained by the court, as the rights and dignity of the court itself.” Ex parte Secombe (1856), 60 U.S. (19 How.) 9, 13, 15 L.Ed. 565, Chief Justice Taney delivering the opinion of the Court.
Almost a century ago, the Pennsylvania Supreme Court explained:
*568 “An attorney-at-law sustains an important relation in the administration of justice. He possesses certain powers and privileges from which others are excluded and assumes important duties and obligations towards both court and client. He is an officer of the former, and a representative of the latter. His position is so responsible, his opportunities for good and for evil are so many that both statute and common law have united in throwing all reasonable safeguards around his conduct. Before he can be admitted to the bar, the [Court] requires him to take an oath or affirmation, inter alia, that he will behave himself in the office of attorney within the court, according to the best of his learning and ability, . . . The court also requires satisfactory evidence or proper knowledge of the law, and of the good moral character of the applicant.
“The power of a court to admit as an attorney to its bar, a person possessing the requisite qualifications, and to remove him therefrom when found unworthy, has been recognised for ages and cannot now be questioned. In fact the power of removal for just cause is as necessary as that of admission for a due administration of law. By admitting him the court presents him to the public as worthy of its confidence in all his professional duties and relations. If after-wards it comes to the knowledge of the court that he has become unworthy it is its duty to withdraw that endorsement, and thereby cease to hold him out to the public as worthy of professional employment." In re Davies (1880), 93 Pa. 116, 120-21.
This Court has said likewise, quoting Lord Chief Justice Cock-burn, In re Hill, L.R. 3 Q.B. 543:
“ ‘When an attorney does that which involves dishonesty, it is for the interest of the suitors that the court should interpose and prevent a man guilty of such misconduct from acting as attorney of the court * * * I should add, there is one consideration I omitted, and which I think is entitled to great weight. It is that put to us in the course of the discussion, namely, that if these facts had been brought to our knowledge upon the application for this gentleman’s admission, we might have refused to admit him; and I think the fact of his having been admitted does not alter his position. *569 Having been admitted, we must deal with him as if he were* now applying for admission; and as, in the case of a person applying for admission as an attorney, we should have considered all the circumstances, and either have refused to admit or have suspended the admission for a certain time, so, where a person has once been admitted, we are bound, although he was not acting in the precise character of an attorney, to take notice of his misconduct.’” In re Wellcome (1899), 23 Mont. 213, 225, 58 P. 47, 51-52.
Justice Cardozo phrased the concept thus:
“Membership in the bar is a privilege burdened with conditions. A fair private and professional character is one of them. Compliance with that condition is essential at the moment of admission; but it is equally essential afterwards. [Citations omitted.] Whenever the condition is broken the privilege is lost. To refuse admission to an unworthy applicant is not to punish him for past offenses. The examination into character, like the examination into learning, is merely a test of fitness. To strike the unworthy lawyer from the roll 'is not to add to the pains and penalties of crime. The examination into character is renewed; and the test of fitness is no longer satisfied. For these reasons courts have repeatedly said that disbarment is not punishment. [Citations omitted.]" In re Rouss (1917), 221 N.Y. 81, 116 N.E. 782, 783.
See also Application of President of Montana Bar Ass’n (1974), 163 Mont. 523, 525, 518 P.2d 32, 33.
I quote these legal authorities at great length to emphasize what may be summarized thus:
“Consider for a moment the duties of a lawyer. He is sought as counselor, and his advice comes home, in its ultimate effect, to every man’s fireside. Vast interests are committed to his care; he is the recipient of unbound trust and confidence; he deals with his client’s property, his reputation, his life, his all. An attorney at law is a sworn officer of the court, whose chief concern, as such, is to aid in the administration of justice. In addition, he has an unparalleled opportunity to fix the code of eithics and to determine the moral tone of the business life of his community. Other agencies, of *570 course, contribute their part, but, in its final analysis, trade is conducted on sound legal advice. Take, for example, a commercial center of high ideals, another of low standards, and there will invariably be found a difference between the bars of the two localities. The legal profession has never failed to make its impress upon the life of the community. It is of supreme importance, therefore, that one who aspires to this high position should be of upright character, and should hold, and deserve to hold, the respect and confidence of the community in which he lives and works. [Citations omitted.]
“ ‘No profession,’ says Mr. Robbins in his American Advocacy, 251, ‘not even that of the doctor or preacher, is as intimate in its relationship with people as that of the lawyer. [T]o his lawyer he unburdens his whole life, his business secrets and difficulties, his family relationships and quarrels and the skeletons in his closet. To him he often commits the duty of saving his life, of protecting his good name, of safeguarding his property, or regaining for him his liberty. Under such solemn and sacred responsibilities, the profession feels that it owes to the people who thus extend to its members such unparalleled confidence the duty of maintaining the honor and integrity, of that profession on a moral plane higher than that of the merchant, trader, or mechanic.’” In re Farmer (1926), 191 N.C. 235, 131 S.E. 661, 663.
My position here and that of Mr. Chief Justice Sands in In re Hansen, 101 Mont. at 503-04, 54 P.2d at 888, bear some comparison. He offered this explanation for his dissent: the findings of the majority were such that, if correct, showed the lawyer to be unfit for the duties of an attorney. Yet, even with such findings the Court recommended a ‘‘penalty . . . wholly inadequate”. 101 Mont. at 504, 54 P.2d at 888. The penalty recommended by this Court, too, is inadequate given the findings of fact which have been made. I would act on the Commission’s recommendation and disbar Joseph Goldman.