STATE EX REL HARTMAN ET AL., RELATORS, *v.* CAD-
WELL, RESPONDENT.

[Submitted April 19, 1895.  Decided May 6, 1895.]

ATTORNEYS—*Disbarment—Alteration of decree.*—In proceedings to disbar an attorney, a finding that an attorney interlined matter in a decree entirely changing its effect and with a corrupt purpose, is supported by evidence that when the decree was examined by two attorneys for the party affected by the alteration immediately before it was signed, it contained no interlineations; that another attorney who had testified in defendant's favor as to the time of making the interlineations, had stated upon being told that the decree was signed in open court, that if that was so he could do the respondent no good; that the decree was filed by defendant upon a peremptory order of the court after he had retained it for four months; and that after receiving intimation of disbarment proceedings had filed a motion to vacate or correct the decree, although he had been discharged as attorney for the plaintiff.

SAME—*Same—Defrauding client.*—A finding that certain notes were not delivered to respondent in payment for professional services and were without consideration, is sustained by evidence that a client of respondent, to defeat the collection of the costs of a criminal prosecution in which he had been convicted, had, upon the suggestion of respondent, executed to him the notes, secured by a mortgage, which were to be de-

posited in a bank subject to their joint orders; that respondent had then been paid for his services and had given his client a receipt in full; that he deposited the notes in bank with the exception of one for $600 which, with the mortgage, he negotiated to an innocent purchaser; that when the client demanded the notes respondent gave him an order on the bank and told him he could not release the mortgage without having it present, but saying nothing about making claim to the note or mortgage until the client wrote him that they were not in the bank, when he replied that he would release the mortgage when the client paid the note.

SAME—*Same—Question presented by disbarment proceedings.*—A charge or conviction of crime is not a prerequisite to proceedings for the disbarment of an attorney. The question presented by such proceedings is not whether the respondent is guilty of a crime of which he has been or ought to be convicted, but whether under all the facts of the case, he is a fit person to be permitted to practice as an attorney.

SAME—*Competency of witness.*—One who entered into a corrupt scheme with an attorney to defeat the collection by the county of the costs of a criminal prosecution against the former, may, in proceedings to disbar the attorney, testify as to the details of the scheme.

APPLICATION for the disbarment of an attorney.    Granted.

*Smith & Word* and *O. F. Goddard,* for Relators.

*Henry N. Blake,* for Respondent.

*E. P. Cadwell, pro se.*

PEMBERTON, C. J.—This is a proceeding for the disbarment of the respondent who is an attorney at law, regularly licensed heretofore by this court, and enrolled as a member of the bar of this state.

The relators are all members of the bar, and comprise some of the most prominent attorneys of the state.    They constitute nearly all the members of the local bar of Gallatin county.

The respondent, as the records of this court show, was admitted to practice law in this state on the 16th day of February, 1891.    He has acquired a considerable practice, and achieved.a prominent position among the members of the profession.

The respondent is charged with being guilty of malconduct in his profession as an attorney and counselor at law.    It is also charged that he is a person whose general moral character is bad; and that he has been guilty of such fraudulent, deceitful, and immoral conduct and practices as to render him an unfit person to practice law in this state, or to be an attorney

and counselor of this court.   The specifications of malconduct and of bad moral character are very numerous.   Upon the filing of the pleadings in the case this court appointed E. C. Day, Esq., whose reputation for ability and integrity is second to no member of the bar of this state, referee, to take the testimony in the cause and report the findings of fact to this court.   This report has been made in which the referee finds that some 17 of the charges are supported by the evidence.   This court is now asked to adopt these findings, and enter the proper order and judgment in the case.

The specifications of malconduct are too numerous to discuss *seriatim*, and to do so would be useless, and without profit. We shall therefore confine our treatment to a few specifications, which are gravest in their character.

Specification "D" is as follows:   "That prior and up to the 28th day of June, A. D. 1893, the case of Barbara Spieth vs. D. F. Grogan and J. P. Grogan, partners as D. F. Grogan & Bro., and Jesse H. Grogan, was pending in the ninth judicial district court of the state of Montana, in and for the county of Gallatin, upon the cross complaint and answer of said Jesse H. Grogan, and the answer and reply thereto of the said Barbara Spieth.   That on or about the 27th day of June, the Hon. F. K. Armstrong, judge of said court, tried the same, a jury therein having been waived by the parties, and made certain findings of fact, and, pursuant to the practice in the said court, required the attorneys for the parties thereto to prepare a decree, and on or about the 29th day of June, A. D. 1893, the said E. P. Cadwell, defendant herein, being the attorney for the said Barbara Spieth, plaintiff, and Messrs. Cockrill & Pierce, two of the relators herein, being the attorneys for the defendant Jesse H. Grogan, appeared in open court before the said judge, and the said E. P. Cadwell, having theretofore prepared a decree in said case, submitted the same in open court to the said Cockrill & Pierce, attorneys for the said Jesse H. Grogan, as aforesaid, and the said Cockrill & Pierce, having examined the said decree, and being satisfied therewith, agreed

with the said Cadwell, in the presence of the said court, that the said decree was satisfactory, and the said E. P. Cadwell immediately handed the same to the said F. K. Armstrong, judge, as aforesaid, for his signature, and thereupon the judge signed the same as so agreed upon, and handed the same back to this defendant, E. P. Cadwell; a copy of which decree so agreed upon and so signed by the said court as aforesaid is attached hereto, and marked "Exhibit A," and made a part of this charge, and thereupon, after receiving said decree, so signed as aforesaid, the said E. P. Cadwell, without the knowledge and consent of the said Cockrill & Pierce, or the said court, or either of them, retained the said decree in his possession and control, and kept it there, and did not file the same with the clerk of the said district court for record, as by law provided, nor would he or did he file the said decree until October 28, A. D. 1893, upon which date, upon motion of the said attorneys, Messrs. Cockrill & Pierce, the said judge entered a peremptory order to the said E. P. Cadwell, requiring him to file the said decree by four o'clock of said day.    And your relators aver that prior to the filing of the said decree by said Cadwell, this defendant, and subsequent to the signing thereof, on the 29th day of June, A. D. 1893, as aforesaid, and while the same was in his possession, custody, and control, he, the said E. P. Cadwell, this defendant, without the knowledge or consent of the said Cockrill & Pierce, or either or both of them, or the said judge of the said court, made in the said decree such interlineations as to wholly change the tenor and effect thereof, and filed the same, under order of the court as aforesaid, and with the clerk of said district court, on the 28th day of October, A. D. 1893; and upon the same or following day, the said H. C. Cockrill, one of the relators herein, went to the office of the clerk of the said court, and found the decree, as interlined, nearly recorded by the said clerk, and, upon an examination thereof, discovered the said interlineations for the first time (a copy of the said decree, so interlined by the said E. P. Cadwell, as aforesaid, is filed herewith, attached hereto,

marked 'Exhibit B,' and made a part of this charge); he, the said E. P. Cadwell, thereby intending to cheat and defraud the said Jesse H. Grogan of his right and interest in and to the real estate described in the said decree. That prior to the rendition of the said decree marked 'Exhibit A,' and attached hereto, there had been rendered in the said suit another decree in favor. of Barbara Spieth against the said D. F. Grogan and J. P. Grogan, under and by virtue of which decree the property mentioned in Exhibit A had been sold to the said E. P. Cadwell, by the sheriff of the said county, he, the said Cadwell, taking the sheriff's certificate of sale in his own name, notwithstanding that he was at that time the attorney for the said Barbera Spieth. And at the time of the said interlineations the said E. P. Cadwell claimed to own all the right, title and interest of the said Barbara Spieth in and to the said certificate of sale of said real estate, and in and to the said decree in her favor, and also all the right, title and interest of the said D. F. and J. P. Grogan in and to the said real estate, under the said certificate of sale, the time for redemption of which by the said D. F. and J. P. Grogan or by J. H. Grogan had fully expired before the said decree was filed by the said Cadwell, as interlined as aforesaid, but had not expired at the date of the rendition of the said decree, and had not expired until on or about the 22nd day of September. A. D. 1893. That afterwards, some time in the month of September, 1893, the said E. P. Cadwell was discharged by the said Barbara Spieth, and ceased to act as her said attorney in the said cause, or in any other action in the said court, and was fully paid by the said Barbara Spieth for all services by him heretofore rendered. That, notwithstanding such discharge and payment, the said E. P. Cadwell (this defendant) having received an intimation that proceedings were likely to be instituted against him for disbarment or otherwise, by reason of such interlineation in said decree, as shown by said Exhibit B, hereto attached, filed in the said court on the 4th day of January, A. D. 1894, a written motion, as the attorney for the said Barbara Spieth, to

'affirm, vacate, or modify' the said.decree, so as to make the same correspond to the 'findings of the court therein,' and gave notice of the said motion upon the motion book of said court.''

The referee finds this charge sustained by the evidence. The decree of the court mentioned above is filed as an exhibit in the case, showing the interlineations the respondent is charged with making therein. The original decree was typewritten; the interlineations are made with a pen, and are confessedly in the handwriting of the respondent. By the original decree, J. H. Grogan, mentioned therein, was adjudged to have a prior mortgage and lien upon all the land mentioned therein, except forty acres, as against all the other parties named in said decree. The words interlined in said decree by respondent are as follows: ''That the defendant J. H. Grogan be, and he is hereby, barred and forever foreclosed from having or claiming to have any interest in said land;'' and were so interlined as to refer to all the lands mentioned in said decree, and to change entirely the effect of said decree, as to the rights adjudged to J. H. Grogan.

The testimony of T. M. Pierce and H. C. Cockrill, attorneys in the case, is clear and positive to the effect that said decree, before being signed by the court, was submitted to them by the respondent for inspection, and that said interlineations were not in it when signed. The respondent swears that they were in the decree when signed. C. G. Bradshaw, an attorney, also says that he suggested that the interlineations be made; and he says that upon his suggestion the respondent wrote them in the decree, and stepped into the judge's office adjoining that of respondent, or near by, and returned in a few moments, saying the judge had signed it. But W. L. Holloway swears that when Bradshaw made this statement to him in a conversation concerning the matter he told Bradshaw that the decree was signed by the judge in open court, and that Bradshaw then said: ''If that is so, I can do Cadwell no good.'' W. G. Fleischhauer's testimony is to the same effect.

The respondent contends that said interlineations did not change the force or effect of the decree as to J. H. Grogan, or any one else.   This may or may not be true.   It is immaterial in this case.   If the decree was not affected by these interlineations, why were respondent and Bradshaw so concerned about having them put in?   Even if they did not affect the decree, and were not intended to affect it, what right had the respondent to alter the decree of the court after it was signed and ordered entered of record?   If these interlineations were in the decree when signed, why did the respondent take it, and keep it in his possession, and refuse to deliver it to the clerk for record for months, and until the court by peremptory order required him to bring it into court, as shown by the undisputed evidence?   And why, as shown by the evidence, did he object to the delivering it for record, when compelled to bring it into court, saying it was prepared by him, and that, if the other side wanted a decree, let them draw or prepare it?   Is such conduct without meaning?   Do these actions of the respondent not only tend to show that the interlineations were made as charged, as to time, but that they were made for the corrupt purpose of defrauding J. H. Grogan, and advancing respondent's interest?   We think the conclusion irresistible.

The action of respondent in filing a motion to vacate or correct this decree, after he learned that steps were being taken to disbar him, tends strongly to show that he understood that these interlineations did affect the decree, and that he felt that his conduct would tend to show when they were made, as well as the corrupt purpose in making them.

Specification "H" is as follows:   "Your relators are informed and believe, and therefore allege the fact to be true: That one Samuel Smith was charged in the district court of the Seventh judicial district of the state of Montana, in and for the county of Yellowstone, on the 15th day of October, 1891, with assault with intent to commit murder, and the said E. P. Cadwell was employed by the said Smith as attorney to defend him on said charge.   That the said case was tried on a change of

venue to the Ninth judicial district court of the state of Montana, in and for Gallatin county, in the latter court, and the said Smith was convicted, and sentenced to imprisonment in the penitentiary for one year; and, after such conviction, at the suggestion of the said Cadwell, for the purpose of covering up the property of him, the said Smith, to prevent the collection of the costs in the said case, the said Smith executed to the said Cadwell, this defendant, a mortgage of all the real estate of the said Smith in Yellowstone county, to secure notes amounting to $2,600, it being agreed by and between the said Cadwell and his said client, Smith, that the mortgage and notes were to be afterward surrendered by him, the said Cadwell, to the said Smith, when the object of their execution, to wit, the defeat of the collection of the costs in the said case, had been accomplished; said notes and mortgage being executed and delivered without any consideration, except as aforesaid, and the said Smith having paid him, the said Cadwell, this defendant, his fee for the said defense, in full, in cash. That afterwards the said Cadwell, this defendant, returned to the said Smith all of the said notes, except one for $600, which said note he, the said Cadwell, sold and transferred to Barbara Spieth, she at that time being a client of him, the said Cadwell; he, the said Cadwell, being her attorney. She, the said Barbara Spieth, having no knowledge whatsoever of the circumstances attending the execution of the said note, and by which the said Cadwell had come into possession thereof."

The referee finds this charge established by the evidence. The mortgage and notes mentioned in the above charge, as well as the written contract between respondent and Smith, and respondent's receipt to Smith, are all filed as exhibits in the case. Smith's testimony is positive as to every allegation in the charge. The respondent contends, and so swears, that the several notes mentioned in the mortgage, including the $600 one, were given for services rendered and to be rendered by him for Smith. Let us examine the evidence. The receipt given by respondent to Smith, of the same date as that of the

notes and mortgage, was a receipt in full to that date.   Smith says in his evidence:   That while he was in jail at Bozeman, Judge L. A. Luce and respondent called to see him.   They were his attorneys.   That as they were leaving the jail he asked them if anything could be done to save his ranch from being taken for the costs of his case by the county.   That Luce said he thought not.   That, as Luce stepped out of the jail door, respondent told him that as soon as he was out on bail he could arrange it for him; that nothing could be done until then.   That he got bail, and went home to Billings. That respondent came to Billings, and met him.   Told him to come to his room at the hotel, and he would fix the matter. That he went with him to his room.   That there the notes, mortgage, receipt and contract were all drawn by respondent. That respondent said the contract was necessary to show consideration for the notes and mortgage.   That, being in a hurry, he signed the notes and mortgage, and took the receipt, and went away, leaving all the notes and the mortgage with respondent, who agreed to put them all in an envelope, and place them in the bank, with an indorsement on the envelope that the papers were not to be taken out except on the order of both himself and respondent.   That he supposed respondent would deposit the papers as agreed.   That the only reason for making the notes and mortgage to respondent was to defeat the county in any attempt it might make to collect its costs of Smith in the criminal case against him.   That there was no other consideration.   That he owed respondent nothing whatsoever.   That the whole arrangement was made and entered into on the suggestion of respondent.   That it was respondent's scheme to beat the county.   That he did not see respondent again until after he was released from the penitentiary. That on his way from Deer Lodge to Billings he stopped off at Bozeman and saw the respondent.   He then demanded of respondent an order on the bank for these notes and mortgage, and that respondent release the mortgage as per agreement. That respondent gave him an order for the papers, but said

he could not release the mortgage without having it present. That he told respondent he would send it up to him when he got it out of the bank, so he could prepare the release. Nothing was said by the respondent then to Smith about the $600 note and mortgage not being in the bank with the other notes. That when he got the papers from the bank the mortgage and $600 note were not among them; only the two $250 notes and the $1,500 note being in the envelope. These three notes were given at the same time the $600 note was, and were all mentioned in and secured by the mortgage. That he at once wrote respondent, telling him that the mortgage was not among the papers in the bank, nor was the $600 note. That respondent replied to this letter, saying he had the mortgage, and would release it when Smith paid the $600 note. This was his first intimation that respondent claimed the $600 note, and would not release the mortgage until it was paid. Suit has been begun by Mrs. Spieth to foreclose this mortgage, and to recover payment of Smith of this $600 note.

Now let us look at this charge as disclosed by the uncontradicted evidence. When Smith called on respondent on his way home from prison, to get these papers, he was, according to respondent's theory, still his client, for respondent contends that these notes and mortgage were all given for service rendered and to be rendered after Smith's release. Was it not, then, a duty respondent owed to Smith, his client, to deal fairly with him, and tell him the truth about these notes and mortgage? Respondent knew then that he had the $600 note and mortgage in his possession. He knew that they were not in the bank at Billings. He knew that he had never placed them there, as he had agreed with his client to do. He knew that he had sold this note, and assigned the mortgage to his other client, Mrs. Spieth. He knew also that in so doing he had deceived Mrs. Spieth. He had sold this note and assigned this mortgage to her without ever telling her about the circumstances under which they were executed. When Mrs. Spieth gave respondent the money, which he applied on the

sale to her of this note, she, according to her testimony, sup-
posed she was making a loan of that amount to the man who
owned the ranch in Yellowstone county, as the respondent, as
her attorney, had advised the loan, telling her the ranch was
worth $2,000, and was good security for the same.    There is
no evidence that she supposed she was buying this note of re-
spondent.    She, it appears, is a German lady, of little Eng-
lish education, and left her money matters almost entirely to
the management of respondent.    Another thing:   If respond-
ent had any claim whatever to the $600 note, why did he not
have the same claim to the other notes?   If all these notes
were given for services rendered and to be rendered, why did
respondent ever consent to have them placed in an envelope,
and deposited in the bank, and not to be taken out except on
the order of both himself and Smith?   If the notes belonged
to respondent, what right had Smith to say they should be put
in the bank, and remain there until he consented to their with-
drawal?   These things, we think, strongly support the evi-
dence of Smith that the only object and consideration contem-
plated in the execution of these papers was to defeat the county
in the collection of its costs, as charged.    These circumstances
also tend to show that the respondent assigned this note and
mortgage to Mrs. Spieth, knowing her to be without knowl-
edge of the circumstances attending their execution, because
he knew they were unavailing and valueless to him, and that
the collection thereof could only be enforced by an innocent
holder.    If so, he was, beyond question, guilty of malconduct
in his profession as an attorney and counselor at law.    He
thereby defrauded one client and deceived another.

It is not without interest to note here the objections of re-
spondent to the testimony of Smith.    He says Smith ought
not to be permitted to testify, because he thereby seeks to im-
peach the validity of this note in the hands of Mrs. Spieth,
who is an innocent holder thereof.    It is true that Mrs. Spieth
is an innocent holder of the note, and respondent's objection
would be of greater force if this were a suit by her against

Smith thereon.   But it is clear from the evidence that she would not have been the holder of said note at all if the respondent had not purposely and corruptly, as we think, withheld from her the facts and circumstances attending its execution when he sold it to her.   He says also that Smith ought not to be heard to testify as to the corrupt scheme entered into with respondent to defeat the claim of the county for costs, because such scheme was not such a one as could succeed under the law; that under the law such scheme was nugatory.   But this scheme, while it did not and could not defeat the county's right to recover costs against Smith, did succeed, it appears, in defrauding Smith of the note for $600.   Why did not respondent think of this when he induced Smith to enter into this fraudulent scheme?   He knew that it was worthless then, as well as at any time afterwards.   It does seem that Smith's unfortunate condition at the time of entering into this arrangement was such as to appeal to any well-paid, honest lawyer for genuine sympathy and fair treatment.   Such objections would be ridiculous but for the wickedness they show.   To what subterfuges does iniquity resort when uncloaked and brought to bay?   While the respondent denies the object of entering into this scheme to defeat the county, he does not deny or attempt to disprove any of the facts and circumstances shown by the evidence, as detailed herein, in relation to the matter, or the transfer by him of said note and mortgage to his client, Mrs. Spieth.

We think the finding by the referee that the two charges above treated are supported and established by the evidence should be approved and adopted by this court.

It is contended by respondent that he ought not to be disbarred in this proceeding, because it is not shown that he has committed or been convicted of any crime.   This contention proceeds upon the theory that this is a criminal proceeding.   In *ex parte* Wall, 107 U. S. 265, 2 Sup. Ct. 569, a leading and exhaustive case on this subject, it is held that "the proceeding is in its nature civil;" that "the proceeding is not for

the purpose of punishment, but for the purpose of preserving the courts of justice from the official ministration of persons unfit to practice in them.'' In this case it is further said, as to the necessity of a criminal prosecution or conviction as a prerequisite to bringing this proceeding: ''Cases may occur in which such requirement would result in allowing persons to practice as attorneys who ought, on every ground of propriety and respect for the administration of the law, to be excluded from such practice. A criminal prosecution may fail by the absence of a witness, or by reason of a flaw in the indictment, or some irregularity in the proceedings; and in such cases, even in England, the proceeding to strike from the roll may be had. But other causes may operate to shield a gross offender from a conviction of crime, however clear and notorious his guilt may be,—a prevailing popular excitement, powerful influences brought to bear on the public mind or on the mind of the jury; and many other causes which might be suggested,—and yet, all the time, the offender may be so covered with guilt, perhaps glorying in it, that it would be a disgrace to the court to be obliged to receive him as one of its officers, clothed with all the prestige of its confidence and authority. It seems to us that the circumstances of the case, and not any iron rule on the subject, must determine whether and when it is proper to dispense with a preliminary conviction.''

In *In re Treadwell*, 67 Cal. 353, 7 Pac. 724, a disbarment proceeding, it is said: ''In the exercise of this power the court deals with the attorney only as an officer of the court in investigating charges against him, for the purpose of determining whether under the proofs, he is a fit person to be allowed to continue to practice as an attorney and counselor in the courts under the license which has been granted to him, and not for the purpose of adjudging whether he is guilty of a commission of a crime for which he ought to be convicted and punished. That can only be done in a criminal court of competent jurisdiction by due process of criminal law. Previous conviction of a crime is not necessary to a proceeding to disbar

an attorney.    If an attorney be found by a court guilty of acts indicating professional moral depravity, the court can, without previous conviction of a criminal offense, prevent the repetition of such official acts by taking away the license under which they have been committed.    This it will do, not only in the interest of justice and of the public, but of the legal profession, which, like the court itself, ought to be free from all suspicion.    It is indispensable that an attorney be trustworthy.''

In *State* v. *Winton,* 11 Or. 456, 5 Pac. 337, it is said: ''Legal knowledge and skill are not the only requisite of attorneys, but they must be conjoined with that ancient requirement of the law, integrity of character.    Before admission to his office, as regulated by the Code, he must prove by evidence satisfactory to the court that he is a person of good moral character, and show by an examination in open court that he possesses the requisite learning and ability.    *   *   *   Upon an order being entered reciting these facts, he receives his certificate of admission, and becomes entitled to practice in all the courts of this state.    The order of admission is the judgment of the court that he possesses these qualifications, and is fit to be intrusted with the responsible duties of his office.    It, in effect, certifies to the community that he is competent to advise in legal matters, or to conduct legal proceedings, and is of such ·good moral character' as will be a pledge to those dealing with him professionally of fidelity and honesty to their interests.    And to this is added the sanction of his official oath to be faithful, upright, and honest in all duties which may devolve upon him as an attorney.    These duties often comprise grave responsibilities and interests of the highest conceivable character; life, liberty, reputation, and property are often intrusted to his care.    It is indispensable that he be trustworthy, and of unswerving integrity of character in his official relations.    As prerequisite to his admission, they must be enduring and distinctive traits of his character while he exercises the high prerogative of his office.    A lapse from them, upon a proper showing, in his official conduct, is fatal to his right to be an attorney.    Justice to the court, protection to the public, and

the honor of his profession alike inexorably demand that he act with fidelity and honesty to the interests intrusted to his care. Whenever, therefore, it is made to appear to the satisfaction of the court that an attorney has been guilty of conduct or acts committed inside or outside of his professional employment, which show him utterly unfit to practice law and to participate in the official ministration of justice, the court will exercise its summary powers, and disbar him." See also Weeks on Attorneys at Law, § 80, and authorities cited.

We think the great weight of authority is to the effect that a charge or conviction of crime is not a prerequisite to the proceeding for the disbarment of an attorney.

The question presented by this proceeding is not whether the respondent is guilty of a crime of which he has been or ought to be convicted, but whether, under all the facts of the case, he is a fit person to be permitted to practice as an attorney and counselor at law in this state.

We think that an attorney who will take a decree of court into his possession, and surreptitiously change and alter it, with the corrupt purpose and intent to defeat the rights of the parties thereto, and to advance his own interests, is not, and cannot be said to be, a fit person to practice and assist in the ministration of law and justice in this state. We think a person who, by one corrupt scheme or transaction, and in the consummation thereof, will willfully defraud one client and deceive another, is not entitled to use the license of this court to carry on such nefarious practices as an attorney and counselor at law in this state.

The respondent also contends that he ought not to be found guilty under charge "H," because, he says, the only witness against him is Smith, who is a pardoned convict. It is true that Smith is in this condition, but nearly all the facts and circumstances detailed in the evidence of Smith are corroborated. The respondent only disputes his testimony as to the purpose of the scheme entered into by them. Smith is not otherwise contradicted. The offense of which he was convicted does not

necessarily degrade him, or detract from his credibility as a truthful man. No attempt was made to impeach his testimony, whereas throughout this whole case the evidence of the respondent is contradicted by other witnesses. His whole defense depends upon his own testimony and that of one C. G. Bradshaw. Bradshaw seems to have been the intimate friend, and sometimes the adviser, of respondent. And, besides, the general reputation of both respondent and Bradshaw for truth and veracity is shown by the evidence to be bad.

Respondent, after some eighteen of his neighbors testified that his reputation in this regard is bad, attempted to defend his good name by offering proof in rebuttal. But we think he did not succeed. Bradshaw makes no such attempt. We therefore find nothing in this contention to authorize us to interfere with the finding of the referee.

There are a number of charges involving the malconduct and bad moral character and want of truth and veracity on the part of respondent as an attorney and counselor at law, but the conclusions reached above render it unnecessary to treat them.

As noted in the statement of this case, the relators constitute nearly all the local bar of Gallatin county, of which they and respondent are all members. Numbered among them are some of the most prominent lawyers of the state, whose high characters and reputations for integrity preclude the idea that in prosecuting this proceeding they have been actuated by jealousy or malice or other impure motives. There is nothing in the case to authorize the belief that they have been controlled by aught else than a desire to protect the courts, the profession and the public from the scandals and wrongs resulting from permitting an unfit person acting as an officer of this court and participating in the ministration of the law in this state.

A careful consideration of the whole case forces us reluctantly to the conclusion that the respondent is an unfit person to practice as an attorney and counselor at law in this state, and that our duty to the courts, the profession, and the public requires at our hands a judgment that he be disbarred.

It is therefore the judgment of this court that the license as an attorney of E. P. Cadwell, respondent, is revoked, and that his name be stricken from the roll of attorneys of this court, and that he is debarred from practicing in any of the courts of this state, or from exercising any of the privileges of an attorney or counselor at law.

DE WITT and HUNT, JJ., concur.