(No. 21318.—

THE PEOPLE *ex rel.* The Chicago Bar Association, Relator, *vs.* MORRIS S. LOTTERMAN *et al.* Respondents.

*Opinion filed October 21, 1933.*

John L. Fogle, for relator.

Elmer D. Brothers, and Maurice L. Davis, for respondents.

Mr. Justice Herrick delivered the opinion of the court:

Upon leave granted, an information in the name of the People of the State of Illinois, on the relation of the Chicago Bar Association, was filed in this court charging Morris S. Lotterman and Bernard L. Becker, severally, with unprofessional conduct as attorneys and counselors at law and requiring each to show cause why his name should not be stricken from the roll of attorneys of this court. The respondents filed an answer, and the cause was referred to a commissioner, who reported the evidence with his conclusions that neither of the respondents' names should be stricken from the roll. Exceptions to the commissioner's findings were filed by the relator.

The evidence shows that the respondent Bernard L. Becker was admitted to the bar in February of 1930; that he was born in Philadelphia, Pennsylvania, in 1907, and has resided in Chicago for the last thirteen years; that ever

since his admission to practice law he has been engaged in such practice in the city of Chicago. The respondent Morris S. Lotterman was admitted to the practice of law in this State in 1929. He was born in Warsaw, Poland, has resided in the United States since he was about six months old, eighteen years of which time he has lived in Chicago. Ever since his admission to practice law he has been engaged in said practice in the city of Chicago. The respondents from February, 1930, until March, 1931, were engaged in the practice of law as partners, under the name of Lotterman & Becker.

On or about January, 1921, Anna R. Kirkpatrick, residing at Paso Robles, California, died testate. By her will she left the sum of $3000 to a nephew, Roland Lynn, in trust, which trust provided, in substance, that the trustee should invest said sum of $3000 in good, safe, sound, interest-bearing securities, and, of the income received thereon, annually pay over to Mrs. John Grimstead the interest on the sum of $1000, and to her daughter, Neva, the interest on the sum of $2000, all for the period of ten years immediately following the death of Mrs. Kirkpatrick, and upon the expiration of the ten-year period to deliver from the securities of the trust $1000 thereof to Mrs. Grimstead and $2000 to her daughter, Neva.

Prior to July, 1930, the respondents had been employed to do some collection work for the American School through M. W. Russell, treasurer of the school. About the 15th of July, 1930, Mrs. DeWinter, who had been theretofore at one time employed by the American School or by Russell, consulted with Russell with reference to employing attorneys to collect the legacies due Mrs. Grimstead, who has remarried since the death of Anna R. Kirkpatrick and whose name is now Mrs. Carrie Edwards. Mrs. DeWinter is a relative of Mrs. Edwards. Mrs. Edwards is hereinafter referred to as Mrs. Grimstead. Russell recommended the respondents. Subsequent to the consultation between Mrs.

DeWinter and Russell, at the request of Mrs. Grimstead and her daughter, Neva, the respondent Becker, about the 15th day of July, 1930, called at their home in the city of Chicago and conferred with them regarding the collection of the legacies. No interest or income had ever been paid by the trustee to either Mrs. Edwards or her daughter during the term of the trusteeship. On this call made by Becker upon Mrs. Grimstead and her daughter he was informed that they had had other attorneys look into the matter but nothing had been accomplished. The collection of the legacies at that time was regarded by Mrs. Grimstead and her daughter as remote and doubtful, and it was in this light that the collection of the legacies was turned over to the respondents.

At the time of this interview Becker was informed by Mrs. Grimstead that she had no money to advance as a retainer; that she and her daughter were in financial distress, and the two ladies requested Becker and his partner to undertake the collection of the legacies. Becker was also then and there given a copy of the will of the deceased testatrix. On the occasion of said interview Becker informed Mrs. Grimstead and her daughter, in substance, that his firm would handle the case wholly upon a contingent basis, compensation for the services of the respondents to be recoverable only if the legacies, or some portion thereof, were collected, the amount of such compensation to be dependent upon the amount of the legacies recovered, and the respondents were thereupon retained to take whatever action might be necessary to effect the collection of the legacies. No retainer was paid. The respondents very promptly wrote letters to the executor and the attorney for the executor of the will of Mrs. Kirkpatrick. No response was received to either of these communications. After a reasonable time had elapsed from the date of writing to the executor and his attorney, the respondents communicated with the clerk of the probate court in which the estate was being admin-

istered, at San Luis Obispo, California. The probate clerk wrote the respondents in reply to their letter, stating, in substance, that the executor's account current filed February 13, 1930, showed the executor charged with $22,125.24, which included cash and real property and represented the total assets of the estate as of the date of the report; also further stating, in substance, that it was the clerk's understanding that there were not sufficient assets to pay all of the specific legacies under the terms of the will; that the executor did not want to sacrifice the real property, and that the executor was holding the estate open, anticipating an increase in value of the real estate. This letter from the probate clerk was received by the respondents the latter part of July, 1930.

A firm of lawyers at Paso Robles was representing some of the other legatees under the will, and the respondents had information of that fact. In December of 1930 the respondents retained this same firm of attorneys in California to represent the interests of Mrs. Grimstead and her daughter, to collect and receive payment of the legacies, and agreed to pay the California attorneys a fee of three per cent of the amount collected. There was no arrangement for the division of this fee of three per cent between the respondents and the California attorneys but all of such fee was to be the fee of the California attorneys. The undisputed proofs showed that the respondents had had very little experience in sending claims to attorneys outside of the city of Chicago, and did not then know it was customary for attorneys who handled the collection in the particular vicinity in which the claim was collected to charge a fee, and, as forwarding correspondents, the forwarder would receive one-third of the fee, the other two-thirds being retained by the attorneys to whom the collection had been forwarded. After the employment of the California attorneys for the respondents they sent powers of attorney to the respondents to be executed by Mrs. Grimstead and her

daughter, authorizing the California attorneys to make collection of the legacies. Certain changes in the powers of attorney forwarded to them were deemed necessary by the respondents and the powers of attorney were re-written by the respondents. These powers of attorney as re-written were executed by Mrs. Grimstead and her daughter and were then forwarded by the respondents to the California attorneys.

During the interval from the time the respondents were retained to represent their clients and the time of the execution of the powers of attorney a number of conferences were had between the respondents and the clients respecting the legacies, the collectibility thereof and the procedure to be adopted in the collection of the legacies. However, at no time prior to the collection of the legacies was the question of the amount of fees to be allowed the respondents for their services settled between the respondents and their clients, nor did the respondents in any way indicate to their clients what the attorneys' fees would be, although respondents, after being retained, did learn that the legacies were collectible at least in part, but the amount of such collection was undetermined and unknown. Afterwards, in the early part of May, 1931, the California attorneys collected the sum of $2289 in full of the legacies and shortly thereafter sent the respondents a draft for $2223, the California attorneys deducting their fees of three per cent on the amount collected.

On the same day that the draft from the California attorneys was received by the respondents they called their clients into their office for the purpose of endorsing the drafts, which were made payable to the order of Mrs. Carrie Edwards and Neva Grimstead. Mrs. DeWinter accompanied Mrs. Grimstead and her daughter to the office of the respondents on this occasion. The drafts were then and there endorsed by the clients. The respondents also on this occasion gave to Mrs. Grimstead and her daughter the receipt

of the respondents for the drafts. Inquiry was also made at this time by the clients as to the amount of fees that the respondents were charging for their services, and in response to such inquiry the clients were told, in substance, by the respondents that their fees were fifty per cent of the amount of the drafts. When the amount of the fee which the respondents were charging for making collection was stated to the clients neither one made any objection but Mrs. DeWinter stated that she thought the fee was exorbitant. On this same day the clients, Mrs. DeWinter and the respondents went to the First National Bank of Chicago, where the drafts were deposited for collection. One of the bank employees receiving the drafts for collection told the clients and the respondents on this occasion that it would be several days before the drafts could be collected and the proceeds remitted to the bank. About two days after the deposit of the drafts with the bank for collection, M. W. Russell, hereinbefore named, called upon the respondents and told them that the proposed charge of fifty per cent of the amount received was excessive and that he was acting on behalf of Mrs. Grimstead and her daughter, who were each dissatisfied with the proposed charge. Subsequent to the conversation with Russell, and prior to the collection of the drafts by the bank, each of the respondents inquired of a different attorney in Chicago as to what would be the proper amount of fees to be charged, in the absence of an express contract, for the collection of the legacies on a contingent basis. One lawyer who had been practicing in Illinois for a period of ten years stated the charge of fifty per cent of the amount collected was a fair and reasonable charge. Another lawyer who had been practicing in this State for a period of six years advised the respondents that a charge of forty per cent of the amount collected would be a fair and reasonable charge.

A few days after the conference between Russell and the respondents with reference to the fees that they purposed

charging for their services for making the collection of the legacies, Russell, acting on behalf of Mrs. Grimstead and her daughter, Neva, employed other attorneys to negotiate with the respondents and come to an agreement as to the amount of fees to be charged Mrs. Grimstead and her daughter. Several conferences and telephone conversations were had during these negotiations between the then attorneys representing Mrs. Grimstead and her daughter, and the respondents. An agreement was eventually reached by the attorneys then representing Mrs. Grimstead and her daughter, and the respondents, by which it was agreed that the respondents should receive forty per cent of the amount collected by them. Thereupon, on the 8th day of June, 1931, the respondents issued and delivered to the then attorneys representing Mrs. Grimstead and her daughter, the check for sixty per cent of the amount collected by the respondents on account of the legacies. This check was accepted by Mrs. Grimstead and her daughter and was cashed by them. On the same occasion of the delivery of the check a general release was executed and delivered by Mrs. Grimstead and her daughter, by the terms of which they released and forever discharged the respondents of and from all of the claims collected by them from the estate of Anna R. Kirkpatrick, deceased, and from all claims on account of any moneys received by the respondents from said estate. During the negotiations between the attorneys then representing Mrs. Grimstead and her daughter, and the respondents, the attorneys then representing Mrs. Grimstead and her daughter told the respondents that the sum of $264 was a reasonable fee for their services.

After the supposed settlement of June 8, 1931, on September 4, 1931, complaint was made to the Chicago Bar Association by M. W. Russell complaining of the action of the respondents in charging the fee of forty per cent on the amount collected by them. The respondents answered the complaint. Thereafter, on December 2, 1931, and on sub-

sequent dates prior to the filing of the information in this case, the respondents appeared before the committee on the hearings had by the committee of the bar association acting in the matter. On one of these occasions the respondents were advised by some of the committee that a fee of $150 would be a maximum, fair and reasonable charge they ought to make for the services rendered by them in the collection of the legacies. Since that hearing the respondents have conferred with many members of the bar of Chicago and have obtained their opinions as to the propriety of the charge made by the respondents for the services rendered by them in the collection of the legacies, and, after making such investigation, on one of the hearings the respondents asked the committee for time to make restitution to Mrs. Grimstead and her daughter of the overcharge made by them, the respondents. However, restitution was not made prior to the filing of the information in this case. Subsequent to the filing of the information herein the respondents have paid to Mrs. Grimstead and her daughter $780 by way of restitution and also by way of paying the fee of $50 charged by the attorneys for Mrs. Grimstead and her daughter in making the settlement with the respondents, so that the respondents have received a little over $100 for their services in the collection of the legacies.

The evidence further showed that at no time did the respondents refuse to pay over to their clients the portion of the moneys not in dispute between them and their clients, but that they, the respondents, were at all times willing to pay over said sum; that they did not at any time undertake, arbitrarily and unreasonably, to withhold from their clients any of such sums not in dispute, and that as soon as they were able to do so they made restitution to their clients over and above the amount suggested by the grievance committee as a fair and reasonable charge. The evidence showed that during the short time in which the respondents had been practicing law their business had consisted principally in the

handling of collections of delinquent rental claims, where their fees were based upon express contracts and varied from one-third to one-half of the amount collected; that they had had very little experience in collecting non-commercial claims, had never had any experience in the collection of legacies or had any experience at all in probate matters, and that the charge of forty per cent made by them for their services in the collection of the legacies was based in part upon the schedule of fees they had been accustomed to charge in connection with the collection matters usually handled by them and also in part upon the opinions of the other attorneys whom they had consulted as to what would be a fair and reasonable fee for their services.

There is no question but that the fee charged by the respondents for their services was grossly excessive. The respondents knew that their clients were at that time practically without any income and were in great need of the moneys they had received from these legacies. The respondents also failed to take into consideration that the collection did not require a great deal of their time, effort or skill. The amount of three per cent fixed by the respondents as a reasonable fee for the services rendered by the California attorneys in collecting the legacies should have been some guide to the respondents in fixing their own fees at a reasonable amount. They should also, when the dispute arose as to the amount of their fees, have made further inquiry of other attorneys at the Chicago bar as to what would be a reasonable fee for the services of the respondents. They at the time the dispute arose as to the fees were young men of the ages of twenty-four and twenty-two years, respectively.

If we were of the opinion that the evidence showed that the overcharge of fees was made solely for the purpose of permitting the respondents to convert to their own personal use the money of their clients under the guise of the fee charged being a reasonable and legitimate charge

for their services we would disbar the respondents. The fact that a settlement has been made between the attorney and client of the matter in dispute does not preclude an inquiry in this character of a proceeding into the moral and professional quality of the attorney's acts prior to and in connection with the settlement. (*People* v. *Grusd,* 318 Ill. 44.) The weight to be given to the fact of restitution is to be determined by the facts in each particular case.

It is a rule of law, where fraud is charged, that all men are presumed to act from honest motives rather than from dishonest motives, and the burden of proof is on the party charging the dishonest motives. It is the duty of the court to protect the public against the wrongful acts of unscrupulous and dishonest attorneys. However, the court also owes a duty to attorneys who, though they have made a mistake in their professional conduct, have not done so through any base, sordid or dishonest motives. A client should not be encouraged to file baseless charges against an attorney simply because there is a dispute between the attorney and client as to the amount of fee charged the client by his attorney.

In the consideration of this case it is to be borne in mind that at the time the settlement was made by the respondents with their clients on the basis of forty per cent attorneys' fee for the amount collected by the respondents, the clients were represented not only by a capable business man but also by a reputable firm of attorneys; that at the time of such settlement the parties were dealing at arm's length, and that there was no effort made during these negotiations, or prior thereto, on the part of the respondents, to retain the whole amount collected, but that they were at all times willing to pay over that portion of the fund that was not in controversy.

Courts are vested with a large discretion in disbarment proceedings. That discretion is not to be exercised in an arbitrary manner but is a legal discretion, to be exercised in accordance with the legal rules and principles for deter-

mining the guilt of the party charged. (*People* v. *Ader*, 263 Ill. 319.) Disbarment of an attorney is the death of his professional life. Regardless of whether the misconduct charged amounts to a crime or merely to professional misconduct, such charge must be proved by clear and convincing testimony. (*People* v. *Kerker*, 315 Ill. 572.) The case made by the record must not only be free from doubt as to the act charged but as to the motive with which it was done. (*People* v. *McCaskrin*, 325 Ill. 149.) In order to justify disbarment, not only must the acts of misconduct be proven by clear and convincing testimony, but fraudulent or dishonest motives must likewise be satisfactorily proved. It is not sufficient to justify disbarment that the evidence, taken as a whole, shows a state of facts discreditable to the respondent. If the evidence, taken as a whole, fails to satisfactorily show that the respondent has been guilty of dishonorable or criminal conduct the charges made by the information cannot be sustained. While in this case the conduct and actions of the respondents were contrary to the ethics of their profession, yet we find from the evidence that they acted in good faith and have not consciously and willfully perpetrated any wrong. The evidence does not establish moral turpitude on the part of the respondents or show any conscious advantage taken by them of their clients, but that ignorance and inexperience in matters of the nature of the claim handled by them dictated their charge of an excessive fee, and that they have made complete restitution to their clients of the excess charged by the respondents over and above the usual and reasonable fee in like cases.

We are of the opinion that the evidence is insufficient, under the rules in disbarment cases, to establish the guilt of the respondents of the charges made by the information.

The exceptions filed to the report of the commissioner are overruled and the rule to show cause why the respondents should not be disbarred is discharged. *Rule discharged.*