In re HANSEN.

(No. 7,418.)

(Submitted January 6, 1936. Decided February 10, 1936.)

[54 Pac. (2d) 882.]

*Mr. H. L. Myers,* Special Prosecutor.

*Mr. D. L. O'Hern, Mr. Hugh R. Adair* and *Mr. C. A. Spaulding,* for accused.

MR. JUSTICE MORRIS delivered the opinion of the court.

This court, in concurrence with the Attorney General, appointed the Honorable Henry L. Myers, a member of the Montana bar and a former member of this court, a special investigator under the provisions of section 8953, Revised Codes of 1921, to investigate charges of misconduct made by various parties against Al Hansen, a practicing attorney at Baker, Montana, and county attorney of Fallon county. The report of the special investigator appeared to confirm the charges of unprofessional conduct on the part of Al Hansen, and on January 3, 1935, this court appointed Judge Myers a special prosecutor with full power to act in the premises. February 19, 1935, the special prosecutor filed a verified complaint setting out twenty-one charges against the accused. Thereupon this court directed the clerk to issue an order and summons to the accused to appear in this court at 10 o'clock A. M., March 16, 1935, and answer to such complaint and charges. The order and summons were served on the accused February 21, returned, and filed with the clerk of the court February 23. March 15 counsel for accused filed a general demurrer to the complaint which was overruled and the usual time allowed the accused to answer. At the same time the accused filed his motion to dismiss eighteen of the twenty-one charges on various grounds mentioned in the motion. After hearing on the motion, specification No. XI was ordered stricken and the motion as to all other specifications was denied. April 15 the answer of the accused was filed, and on April 16 the Honorable H. L. De Kalb, of Lewistown, Montana, an able and distinguished member of the Montana bar and also a member of the board of bar examiners of the state, was appointed referee to hear the evidence on the issues raised and return his findings of fact and conclusions of law and recommendations to this court.

The hearing before the referee was begun at Baker, Montana, May 27, 1935, and continued some three days; numerous exhibits were introduced and many witnesses were examined either

orally or by deposition. At the close of the hearing respective counsel were allotted time in which to prepare and file briefs. December 2 the referee made his report to this court, certifying up the exhibits, depositions, transcript and briefs.

Of the twenty-one charges set out in the complaint, No. XI had theretofore been stricken, and at the close of the hearing the special prosecutor admitted that there was not sufficient evidence to support charges IV, XII, XX and XXI, and the five charges here mentioned were eliminated from further consideration. The referee recommended that the accused be reprimanded for negligence and carelessness. December 10 counsel for the accused filed a motion praying that the findings and recommendations of the referee be adopted and carried out, stating, however, that they did not agree with findings I and V and conclusions a and c. December 11 the special prosecutor filed his exceptions to the findings and conclusions of the referee, and moved this court to review the same. The motion of the special prosecutor was granted and the hearing was had before this court January 6, 1936. After careful examination of the evidence and extended consideration of the authorities, we are of the opinion that the honorable referee was entirely too lenient toward the accused in the recommendations made.

The first question arises on the special prosecutor's exceptions to the referee's finding on charges I, II and III. These three charges all relate to matters arising out of the employment of the accused by the Northwest Properties Corporation of St. Paul, Minnesota, which, for the sake of brevity, will hereafter be referred to as the corporation, to sell for its account fifteen shares of the capital stock of a bank at Ismay, Montana. The referee found that such employment was in the capacity of agent and that the relation of attorney and client did not exist between the accused and the corporation. This finding is excepted to by the special prosecutor, who contends that it is contrary to the evidence, and that the accused admitted "three times" that he performed legal services for the corporation in connection with the sale of the stock. This exception brings up the most

494

important question involved in this proceeding and will be considered at length.

March 21, 1930, the corporation sent the accused the fifteen ▮ shares of stock to sell, and it was agreed that the accused should have five per cent. commission for making the sale. Within a week the accused sold the stock, received a check for $450 in payment thereof, indorsed the check and received the full amount in money, appropriated it to his own use, but made no report of the sale to the corporation. The accused did not reply to numerous letters the corporation sent him requesting a report in the matter and did not make acknowledgment that he had sold the stock and collected the money until suit had been begun by the corporation against him, and in his answer, verified by his attorneys, denied all the material allegations of the complaint, except that he had received the stock for sale. When the corporation was unable to get any answer to its numerous letters addressed to the accused, it wrote the cashier of the Ismay bank requesting advice as to whether the stock had been transferred on its records or not. October 29 the cashier of the Ismay bank wrote the corporation advising that the stock was sold to the Ismay Realty Company and transferred on the Bank's records in April, 1930. A subsequent letter by the corporation to the bank elicited the information that the price paid the accused was $450. December 2 the corporation, still being unable to hear from the accused in answer to letters written, employed Loud & Leavitt, attorneys at Miles City, to collect the account from the accused, and after some delay suit was begun in the name of the corporation against Hansen. The corporation at that time suggested to its attorneys that Hansen's conduct should be reported to the Attorney General. Later it requested Loud & Choate, Mr. Choate having in the meantime succeeded Mr. Leavitt in that firm, to begin disbarment proceedings against Hansen. Shortly after suit was filed on March 3, 1932, Hansen paid Loud & Choate $40 on account and proposed giving his note or notes to be paid in installments. The payment of $40, which was the first acknowledgment on the part of

Hansen that he owed the corporation anything, was, as heretofore stated, made one year and eleven months after Hansen had sold the stock and received the cash for the sale. On March 23, 1931, prior to Leavitt's retirement from the firm of Loud & Leavitt, Leavitt advised the corporation that he had seen Hansen about the account and that Hansen advised Leavitt that he had settled the account with the corporation. On receiving that advice the corporation promptly advised Loud & Leavitt that it had not only had no settlement of the account, but had not even heard from Hansen. March 13, 1933, the corporation wrote Loud & Choate again requesting them to begin disbarment proceedings, which they, for certain professional reasons, declined to undertake. Hansen later made a payment to Loud & Choate on the account, which, it appears, was about a year after the $40 payment was made, and again requested that his note or notes be accepted for the balance and that he be allowed to pay on the installment plan. Again the corporation refused to accept his notes. Hansen, however, continued to make payments on the account direct to the corporation, and on January 12, 1934, three years and ten months after Hansen had sold the stock and received the money, the corporation wrote Loud & Choate that Hansen had paid up in full, including interest and costs, and shortly thereafter the corporation dismissed the action.

On the hearing before the referee, Hansen made the defense that he had an understanding with the corporation that if he made the sale of the stock he might retain the money as a loan. It does not appear in any of the correspondence that such arrangement was contemplated at any time by the corporation or even mentioned, and it will be noted that the corporation twice refused to accept Hansen's note for the balance due. No such defense was interposed by Hansen in the suit by the corporation against him, nor specifically pleaded in the disbarment proceeding. Such defense was first advanced at the hearing before the referee. The deposition of an officer of the corporation had been taken and Hansen's counsel submitted cross-interrogatories in

that deposition, but there was no interrogatory submitted by either party suggesting the defense that Hansen was to have the money as a loan. The referee found that Hansen's contention about any loan arrangement between him and the corporation was not sustained. By not advancing such defense prior to the hearing, the opportunity for the corporation to deny any such arrangement was avoided. A. H. Markert, secretary of the corporation and the officer who represented the corporation in all its dealings with Hansen, was a witness in the proceeding and gave his deposition only after urged to do so by Loud & Leavitt, the special prosecutor, and others, and if Hansen had had any understanding that he was to retain the proceeds of the sale of the stock as a loan, Markert, being fully satisfied after receiving the corporation's money, would obviously have been ready and willing to testify to such fact. When Markert repeatedly wrote Hansen in 1930 and 1931 demanding a report of the sale of the stock, no one can doubt that Hansen could have readily adjusted the matter by reminding Markert of the loan arrangement, and that also would have eliminated this charge in these proceedings. The record clearly sustains the findings of the referee that the evidence does not support Hansen's contention that any loan arrangement existed. Hansen on direct and cross examination admitted that he collected the money on the check he received in payment for the stock and appropriated it to his own use. The record clearly sustains this charge against the accused, and the magnitude of the offense of the accused is aggravated by his taking the witness-stand and testifying under oath to a defense which he failed to sustain.

Whether Hansen was acting in this matter as agent or as an attorney for the corporation we think is immaterial. There are decisions that make such distinction, but the great preponderance of authority and the sounder reasoning hold attorneys to the same sound practice in all transactions, whether professional or otherwise, and require of him in his private as well as his professional character the same standard of fair and upright dealing. This rule is founded on the unimpeachable

ground that "as good character is an essential qualification for an admission of an attorney to the bar, he can be removed whenever he ceases to possess such character" (6 C. J. 584), and is supported by numerous decisions. (*State ex rel. Hartman* v. *Cadwell*, 16 Mont. 119, 40 Pac. 176, 181; *In re Wellcome*, 23 Mont. 140, 58 Pac. 45; Id., 23 Mont. 213, 58 Pac. 47; *In re Thresher*, 33 Mont. 441, 84 Pac. 876, 877, 114 Am. St. Rep. 834, 18 Ann. Cas. 845; *Bartos* v. *United States Dist. Court*, (C. C. A.) 19 Fed. (2d) 722; *People ex rel. Healy* v. *Macauley*, 230 Ill. 208, 82 N. E. 612, 120 Am. St. Rep. 287; *Norfolk & Portsmouth Bar Assn.* v. *Drewry*, 161 Va. 833, 172 S. E. 282; *In re Wilson*, 79 Kan. 450, 100 Pac. 75; *Moore's Case*, 76 N. H. 227, 81 Atl. 703; *In re Young*, 75 N. J. L. 83, 67 Atl. 717; *Matter of Kalisky*, 169 App. Div. 531, 155 N. Y. Supp. 550; *Matter of Isaacs*, 172 App. Div. 181, 158 N. Y. Supp. 403; *Matter of Berkeley*, 174 App. Div. 205, 160 N. Y. Supp. 1093; *In re Holton*, 36 R. I. 114, 89 Atl. 242; *In re Turner*, 104 Wash. 276, 176 Pac. 332; *In re Walcen*, 190 Minn. 13, 250 N. W. 798; *People* v. *Lotterman*, 353 Ill. 399, 187 N. E. 424; *State ex rel. Montgomery* v. *Estes*, 105 Or. 173, 209 Pac. 486; *In re Spriggs*, 36 Ariz. 262, 284 Pac. 521.)

In *State ex rel. Hartman* v. *Cadwell*, supra, this court said: "Whenever, therefore, it is made to appear to the satisfaction of the court that an attorney has been guilty of conduct or acts committed inside or outside of his professional employment, which show him utterly unfit to practice law and to participate in the official administration of justice, the court will exercise its summary powers, and disbar him."

In the case of *In re Wellcome*, 23 Mont. 213, 225, 58 Pac. 47, 52, quoting from a Michigan case (*In re Mills*, 1 Mich. 392), and as a justification for taking into consideration other grounds than those provided by statute in disbarment proceedings, this court said: "If our courts are restricted to the causes set forth in the statute, there would seem to be a lamentable defect · in our laws. The words 'deceit' and 'malpractice' in the statute have direct reference to the conduct of an attorney, as such at-

torney; and, if the authority of our courts to remove or suspend an attorney is to be thus restricted to *official* delinquencies, it follows that, however degraded his moral character may be,— whatever fraud or deception he may be guilty of,—if such fraud or deception is unconnected with his *professional* acts, he is deemed worthy of a place at the bar. In other words, an individual may be guilty of acts which involve a violation of every moral precept, and yet retain our license and practice in our courts, provided these acts were committed in his *private,* and not *official,* capacity. * * * That no person can faithfully and honorably discharge the delicate and responsible duties of an attorney, unless fortified by strong moral principles, is too clear for argument. The *nature* of those duties necessarily implies the possession of high moral character. * * * If it be necessary, to gain admission to the bar, that a person should furnish the evidence of 'moral character,' * * * how infinitely greater the necessity that he should actually possess that character when he shall have entered upon the active and exciting theater of professional life.''

In the case of *In re Thresher,* supra, this court said: ''Subdivision 5 of the section under which the charges are preferred is broad enough to include crimes and misdemeanors of all kinds involving moral turpitude, whether within this jurisdiction or not, and whether *within* or *without* the sphere of official duty.''

The answer of the accused alleges that settlement was made ▮ with the corporation to its entire satisfaction, and such allegation is emphasized by counsel as a reason why the motion to adopt the referee's recommendations should be granted, but we are not impressed by such argument. Restitution under compulsion, after the accused by a court action is brought face to face with his offense, entitles him to no credit under the circumstances as they are shown by the record. Furthermore, the accused showed very little appreciation for the gravity of the charges he was called on to answer here. These disbarment proceedings were not instituted to bring discredit upon the accused if that could be avoided, but to meet and clear away the

alleged reprehensible acts charged as having been committed by a member of this bar who has been licensed to practice and thereby recommended by this court to the public as a worthy and honorable member of the profession. Instead of aiding in the proceedings to clear his record, the accused made a very unsatisfactory witness in his own behalf. He could not find important letters and documents vital in determining particular facts; he evaded direct answers to pertinent questions, sought to evade incriminating acts by placing the blame on employees in his office, met many questions by the answer that he could not remember when it was vital to his own defense that he should know what the facts were that were inquired about, and from his testimony it appeared that he was not informed about important transactions consummated in his office which, if improperly handled, would reflect upon his integrity. Such an attitude in a proceeding of this nature is not consonant with plain dealing and a good conscience. Instead of seeking to escape from liability for his acts, he should have been the first to aid in their refutation.

It appears from the exhibits in evidence that while negotiations were pending prior to placing the stock in the hands of the accused for sale, many letters were exchanged between the corporation and Hansen. After the sale the corporation wrote numerous letters to Hansen asking for a report on the sale of the stock, and could get no word from him, and obtained no information directly from him or any acknowledgment that he was holding the money, until one year and eleven months after Hansen had come into the possession of the money, and then only after suit had been begun. After the suit was begun, Hansen obviously realized that the corporation was in a position, if it saw fit, to make the situation very embarrassing for him, and he wrote it some fourteen times, telegraphed its officer, and in a letter Hansen wrote to Markert on April 15, 1935, subsequent to the time these proceedings were begun, it appears that Hansen's sister had called on Markert and had gone over "the situation" with Markert, and in that letter Hansen makes this

significant statement: "It seems to me that your file is your own and you don't have to divulge any of that file to anyone, it is not any of their business. If it is an affair between attorney and client, the communications are, of course, privileged and no one has a right to see them. I have no right to divulge my file without your consent and you have no right to divulge your file without my consent. They are personal property in any event and pertain to matters in which only we ourselves are concerned." By this letter it is obvious that Hansen sought to set up the relation of client and attorney to keep the corporation files relating to his transactions from reaching the prosecutor in this proceeding.

On counsel's contention on the merits of Hansen's having settled with the corporation, if that defense justified the acts of the accused, anyone might appropriate the goods or money of another and use them until compelled by an action at law to account and be guilty of no offense against the law or against good morals. As has already been said, this is not a proceeding to punish the accused, but only to maintain the integrity of the bar and protect the public against the acts of unscrupulous attorneys. Restitution may palliate the offense but not excuse it. (*Ring* v. *State Bar of California*, 218 Cal. 747, 24 Pac. (2d) 821; *People ex rel. Chicago Bar Assn.* v. *Lotterman*, 353 Ill. 399, 187 N. E. 424; *In re Cloud*, 217 Iowa, 3, 250 N. W. 160; *People* v. *Hansen*, 352 Ill. 144, 185 N. E. 225.) Furthermore, if the accused had not made restitution in this matter, he could have made no plausible defense in this proceeding, and judging from the aggressive actions taken by the St. Paul concern to collect the money the accused had appropriated, if Hansen had not paid up, it is not reasonable to assume that it would have permitted the matter to rest, but would have instituted appropriate actions to bring the accused to the bar of justice. No doubt the accused appreciated this situation and concluded that he could not afford to leave any stone unturned that would free him from the consequences that might logically follow, and when restitution is made, as here,

only under compulsion no virtue may be claimed for it. (*In re Zahn,* 356 Ill. 283, 190 N. E. 419.)

It is contended by counsel for the accused that this proceeding has been instituted by Hansen's political and business rivals, and there is evidence in the record to give credit to such contention. That, however, is no defense. If the accused were not vulnerable to such attack, but had kept his skirts clear, he could have readily repelled them. Instead of meeting this attack as a man of integrity would when unjustly accused, we find him endeavoring to have information suppressed on the ground that it involved the relation of attorney and client, and setting up a defense he failed to sustain.

There is another phase of the relation existing between the ▉ bar and the court vitally involved not heretofore specifically emphasized that places on this court a positive obligation to take a forward and unfaltering attitude against any such practices by an attorney as are shown to have been indulged in by the accused. There are well-recognized standards governing the relation of the attorney, not only in his transactions with clients, but with the court and the public, that are forcibly set out in the case of *State* v. *Barto,* 202 Wis. 329, 232 N. W. 553, a Wisconsin case, which, however, we will not take the space to repeat here, but in substance are to the effect that attorneys are officers of the court; they may be admitted to practice only by authority of the court; and it is universally held that courts have inherent powers over members of the bar over and above statutory provisions. This power is briefly adverted to in the excerpt from *State ex rel. Hartman* v. *Cadwell,* supra, where the court referred to the "summary powers" to disbar attorneys. This power may be likened to the power of a legislative body to exercise summary powers over its membership. It is an inherent power and may be exercised under the principles of the common law on the theory that it is the court's prerogative to control its own officers. (*In re Keenan,* 287 Mass. 577, 192 N. E. 65, 96 A. L. R. 679; *In re Haddad,* 106 Vt. 322, 173 Atl. 103; *In re Cloud,* supra; *In re Richards,* 333 Mo. 907, 63

502

S. W. (2d) 672; *Gould* v. *State*, 99 Fla. 662, 127 So. 309, 69 A. L. R. 699.) These are but a few of the later decisions on this point, but the rule is recognized in practically all jurisdictions, even where the statutory provisions materially vary. It is the practice in all jurisdictions that if an attorney be convicted of a crime and such fact is formally brought to the knowledge of the court, the court has inherent power without further ceremony to strike his name from the rolls. Even if an attorney be arraigned and tried and not convicted or indicted and the proceedings dismissed, nevertheless the court may look into the proceedings by appropriate action, and if the facts established justify suspension or disbarment, the court will exercise its prerogative and take such action as the facts warrant.

The remaining eleven specifications reveal the same general characteristics of the accused. All relate to transactions in which money or other property was involved, and to repeat them here in detail would be largely a repetition of what has already been said. Many of them are unimportant, standing alone, but taken as a whole they reveal practices and habits in business and professional transactions that, persisted in, naturally and inevitably tend to bring reproach upon the profession.

A careful analysis of the attitude of the accused in the numerous transactions upon which the charges are founded conclusively demonstrates to our minds that the accused has not maintained that integrity of character which the court believed he possessed when he was admitted to practice and which must be sustained by officers of this court and by members of the bar of the state. We firmly decline to recognize any distinction between the private and professional conduct of an officer of this court, even admitting that the transactions here involved were, in some instances, nonprofessional.

Without any intention to measure the offense of the accused by any financial standard, but realizing that suspension from practice deprives the attorney of his means of livelihood, and is in the nature of a money penalty, our decision is that the accused appear at the bar of this court at 9:30 o'clock A. M.

on the fifteenth day of April, 1936, to be reprimanded by the court for conduct.tending to bring reproach upon the profession and the court, and that he pay $750 of the more than $2,000 of the costs of this proceeding to the clerk of this court, making such payments in three equal installments of $250 each, the first payable June 15, 1936, and one installment on the 15th day of each fourth month thereafter, or on September 15, 1936, and January 15, 1937, until the full $750 is paid, and upon failure to pay any one of such installments he shall automatically be suspended from practicing as an attorney at law until such installment shall be paid; and upon failure to appear before this court on April 15, 1936, as heretofore directed, the accused, unless good cause is shown for not appearing, shall be suspended, to be reinstated only after complying with all the requirements necessary for admission.

ASSOCIATE JUSTICES MATTHEWS, STEWART and ANDERSON concur.

MR. CHIEF JUSTICE SANDS, Dissenting: I am not physically able closely to examine the very extended record in this case to determine my opinion of the guilt or innocence of the accused. I agree with the general observations in the majority opinion, however, particularly the rejection of the recommendation of the referee that, since certain transactions of the accused were not performed in his capacity as attorney, this court is then without authority to enter into a consideration of the liability of the accused in these disbarment proceedings. If a lawyer is not an honest man, he will not be an honest lawyer, and honesty is an essential qualification for admission to the bar. The bar cannot afford to have dishonest men practice under its banner, and the public is entitled to insurance by this court that dishonest men are not knowingly, under the sanction of the bar, permitted to prey upon it.

The majority opinion brands this man as a man of such criminal tendencies that, if correct, unfit him for the highly

confidential duties of an attorney at law. He is found to be dishonest, to have committed perjury at the trial, and to have attempted to deceive the court. The dishonesty might merit the mercy of the court under the present unusual economic conditions, but the deliberate attempt to deceive this court should merit our contempt, and the perjury found by the court, which could not possibly have resulted from the mistake of accused, is unpardonable and warrants severe punishment. The Penal Code punishes perjury by imprisonment in the penitentiary of from one to fourteen years (Rev. Codes 1921, sec. 10888). We are excusing him after finding him guilty by the penalty of a reprimand and $750 fine. He still insists he is innocent and he is not praying for mercy. The penalty, under the findings, is wholly inadequate. I therefore dissent.