(No. 28233.—
*In re* McLin J. Brown, Attorney, Respondent.

*Opinion filed January 17, 1945—Rehearing denied March 19, 1945.*

GEORGE C. HOFFMANN, of Springfield, for the Illinois State Bar Association.

WILL P. WELKER, of Vandalia, LESTER K. VANDEVER, HERBERT W. DEY, both of Hillsboro, and J. D. WILSON, of Nokomis.

Mr. JUSTICE MURPHY delivered the opinion of the court:

This is a disciplinary action prosecuted under Rule 59 against McLin J. Brown, and comes to this court on the recommendations and findings of the commissioners and respondent's exceptions thereto. The recommendation of the commissioners is that respondent's right to practice law should be suspended for one year. Respondent takes exceptions to ten of the thirteen findings of the commissioners and contends that some of them are inconsistent with each other, that others are not supported by competent evidence and that in some of the findings the commissioners gave credit and weight to statements which were mere conjectures of the witness or based upon hearsay.

Respondent was admitted to the bar of this State in December, 1910, and in January, 1914, formed a partnership for the practice of law with John L. Dryer, under the firm name of Dryer and Brown. Such partnership continued until January, 1936, when Omer J. Poos was taken into the firm, and thereafter the firm name was Dryer, Brown & Poos. This latter arrangement continued until Dryer's death, on March 16, 1939. For many years the firm had represented certain public utilities doing business in southern Illinois. The Illinois Power Company, the corporate name of which was later changed to Illinois Iowa Power Company, was among the firm's clientele. A part of the law firm's business with this company, from about 1926 to the date of Dryer's death, furnishes the basis of this inquiry. Practically all of the capital stock of the power company was held by the North American Light & Power Company. The latter company was also the holding company for the stock of Missouri Power & Light Company, a corporation operating in the State of Missouri. The greater part of the time covered by this report, the same person was president of both the Illinois and Missouri companies.

The substance of the complaint as set forth in the resolution starting the inquiry was that Dryer and Brown, and later the firm of Dryer, Brown & Poos, issued bills for services to the Illinois Power Company, which services were never rendered, that the power company, conniving in such practices, paid such fictitious claims to the law firm, that the members of the partnership divided the proceeds thus obtained and that thereupon respondent Brown, at the request of Dryer, repaid to Dryer the portion of the fictitious claim which he had received. It was alleged that upon the receipt of such money from the members of his copartnership, Dryer repaid it to the power company to be used by it as a secret slush fund in the bribing of public

officials and politicians of this State and of the State of Missouri. It was also charged that in certain instances, Dryer kept such fees and used them in the making of political contributions and illegal payments to various public officials and policitians in this State, all in the interest of the power company.

It was stipulated that a transcript of what respondent testified to before the grand jury for the District Court of the United States in Springfield in September, 1940, should be admitted. At that time the grand jury was investigating certain transactions of the power company to ascertain whether Federal laws had been violated. The only other evidence is respondent's testimony introduced on the hearing before the commissioners in October, 1943. There are inconsistencies in the evidence given by respondent on these two occasions, but it should be noted that a part of such inconsistency can be accounted for by the fact that at the latter hearing respondent was able to testify from facts shown by the records of the power company which were not available to him and of which he had no knowledge when he testified before the grand jury.

Through the years, respondent's firm received a retainer fee payable monthly. It started at $200 per month, and increased until, in the years immediately preceding Dryer's death, it was $400 per month. In consideration of this retainer, respondent's firm was rendering certain minor services. During the years, they were engaged in other matters for the company for which they received additional compensation. Respondent assisted in the performance of such services but Dryer had practically all the contacts with the power company and its officers. The business handled by the firm was so exclusively with Dryer that in an action respondent started against the power company after Dryer's death to recover a balance due on fees, the power company interposed the defense that respondent was

not employed by it. This case is still pending but there is nothing in the record to impeach the good faith of the power company in interposing such defense.

Respondent's information on the things to which he testified on each occasion came from one of three sources: (a) what Dryer had told him, (b) the facts disclosed by the books and records of the firm, and (c) the information he obtained from certain exhibits which the power company produced in response to an order of the court entered in the suit respondent brought against the company for fees. There is no evidence that respondent actually participated in any of the illegal acts of which, it is conceded, Dryer and the power company were guilty.

The books of account, as kept by respondent's firm, did not show all the services rendered or the fees charged or collected by the firm from the power company. In explanation of such methods of bookkeeping, respondent testified that Dryer told him that the president of the power company had requested that such matters be omitted from their books.

The evidence shows that Dryer had, for several years prior to his death, prepared the firm's vouchers for fees due from the power company. The vouchers were prepared monthly and included fees for services actually rendered, expenses incurred in attending to matters for the company, and at times included claims for services which had not been rendered. With the connivance of the company, the fictitious claims were paid to the law firm or to Dryer. If they were paid to the firm and distributed to the members, then each partner paid the proportion he had received to Dryer. The result was that all fees paid for fictitious claims were returned to Dryer. It does not appear that respondent received any part paid on such illegal claims. He did receive his part of the fees for services actually rendered.

The fees collected for fictitious claims are referred to in respondent's evidence as "kickbacks," and he stated "there was a kickback every year," which, it appears, started about 1930 and continued until Dryer's death in 1939. He also stated that a part of the kickback was paid to the then president of the power company, a part expended by Dryer on behalf of the company and a part applied to satisfy a loan which Dryer had made to the president of the company.

His evidence as to the loan is that in 1934 Dryer told him that the person who was then president of both the Illinois Power Company and the Missouri Power Company wanted their law firm to loan him $20,000 and that the reason for asking for the loan was that the Missouri Company was having trouble with the tax commission or the public service commission, or both, in the State of Missouri, and that the president needed the $20,000 to pay to a political organization operating in that State. The organization referred to later became widely and unfavorably publicized as the Pendergast machine. The purpose of the payment to the machine was to gain the favor of one or both of such commissions in their dealings with the Missouri Power Company matters. Respondent declined to participate in the loan and Dryer loaned the $20,000 from his personal funds. There was no written instrument executed evidencing the debt.

When Dryer became ill in June, 1938, a part of the loan had not been paid, and after such illness two fictitious claims were presented by some one of the firm other than respondent, and the power company paid them. On October 4, 1938, the power company check for $7500, payable to the firm of Dryer, Brown & Poos was delivered to the firm and divided between the three partners. Respondent says Dryer was to have $2100 of such amount and he gave Dryer his check for $700. A few days thereafter, another check was received from the power company of which re-

spondent paid Dryer $700, following the same procedure of checking as the one of October 4. The evidence indicates that such payments discharged the $20,000 loan which Dryer had made in 1934.

Another transaction relevant to the inquiry pertains to money which Dryer received from the power company through the medium of fictitious claims for services and which were used by him in making payments to members of the Board of Review of Madison county to secure a reduction in the company's property assessment. Respondent is not definite as to the amount paid for such illegal purpose in any year, but the substance of his testimony is that Dryer gave him sufficient facts to apprise him that it was an annual affair and that, through several years of such practices, a considerable amount was paid. Respondent estimates the amount paid in one year as being about $2000. There is no evidence that respondent contacted any of the members of the board of review or that he even knew who they were. His source of information on this matter was what Dryer told him at various times. He does not question but what the facts Dryer gave him had at least a semblance of truth in them, but he contends that what Dryer told him is vague, conjectural and, in part, based upon hearsay.

Although the evidence is not clear as to other illegal transactions, there are statements in respondent's testimony which indicates that he at least suspected that Dryer's activities in behalf of the power company were not confined to the legitimate practice of the law. He stated that he knew Dryer maintained rooms in a hotel in Springfield, during sessions of the legislature, at the expense of the company; that he had been there when members of the legislature were in the rooms and that they were dining and drinking at the expense of the power company. There is nothing in his evidence to show that he knew of money being paid any member of the legislature as a bribe, but

it is shown that he knew the rooms and the favors of food and drink were furnished to certain members of the legislature with the expectation that it would bring favor in legislative matters in which the power company might be interested. In fact, he said that in 1934 or 1935 he cautioned Dryer that if he did not quit lobbying, he would ruin both of them. Dryer's appearance as a lobbyist at Springfield ended in 1935.

There is evidence which points to Dryer's activities in behalf of the power company in spreading propaganda to influence local elections held in various cities where it was to the interest of the company to have a certain result in an election involving the removal of a competitor in that field. The evidence on this point is so vague and indefinite that it fails to prove any illegal acts of Dryer.

Respondent's firm filed its partnership income tax return and respondent, as well as the other members, filed individual returns. The result of the returns was that each member paid income tax on the fictitious fees received by him, making no allowance for the amount repaid to Dryer. Thereafter Dryer repaid respondent for such excess fee and, from investigation made after Dryer's death, respondent seems convinced such payment was from Dryer's personal funds and not from the power company's money.

The picture presented by the facts related shows that Dryer for a period of years lent the cloak of his profession to the Illinois Power Company by rendering fictitious claims for services that the company might, under the guise of such claim for fees, withdraw money from its treasury and use it for illegal purposes. His acts aided the company to falsify its records thereby deceiving persons interested in the corporate assets, and public officials whose duty it was to ascertain the true facts from its records. The money thus withdrawn was to be used in the bribing of public officials. Such conduct on the part of a lawyer deserves the severest condemnation.

The question is as to whether the evidence showing respondent's relation to such illegal transactions is sufficient to warrant disciplinary action. The question cannot be determined by application of the familiar principle that holds a partner civilly liable for the wrongful acts of the copartner committed in the course of the partnership business, for the reason that disciplinary actions involve the motives with which the respondent committed the act. In many cases this court has announced the rule that, to justify disbarment, the case must be clear and free from doubt not only as to the act charged but as to the motive. (*In re Greenberg*, 380 Ill. 417; *People ex rel. Chicago Bar Ass'n* v. *Lotterman*, 353 Ill. 399; *People ex rel. Rock Island County Bar Ass'n* v. *McCaskrin*, 325 Ill. 149.) In order to justify disbarment, not only must the acts of misconduct be proved by clear and convincing testimony, but fraudulent or dishonest motives must likewise be proved. It has been said that it is not sufficient to justify disbarment that the evidence, taken as a whole, shows a state of facts discreditable to the respondent. It must show dishonorable or criminal conduct before disbarment will be warranted. *People* v. *Lotterman*, 353 Ill. 399.

There is no evidence which shows respondent actually participated in preparation of the claims for fees that were not earned, nor is it shown that he had a part in the payment of any of the "kickback" money to public officials. On the other hand, the evidence does show he knew Dryer was issuing the false statements in the firm name. In writing checks for the purpose of transferring to Dryer the part he had received of such fees, respondent thereby aided Dryer and the power company to effectuate their scheme and to make the transaction more difficult to trace. As a lawyer with many years of experience, he knew that the conduct of Dryer and the power company would result in falsifying the contents of the records of the power com-

pany as to its just claims. He knew that such practices were instruments of fraud and deception.

In justification of his acquiescence in such practices, respondent speaks of the unbounded faith and confidence he had in Dryer. He testified that Dryer was held in high esteem in the business and civic life in which he lived, and his honesty and integrity were not questioned. He cites these matters as a reason why he did not question Dryer's conduct or, as he terms it, "put him on the carpet." Knowledge of such matters may have furnished him a reason why he should be slow in concluding that Dryer was guilty of wrong-doing, but when he became convinced of Dryer's wrong-doing, it would not excuse him from protesting Dryer's acts and the use of the name of the law firm. The evidence is convincing that long before Dryer's illness in June, 1938, he knew that some of Dryer's and the power company's transactions would not stand the light of an investigation when the true facts were revealed. It is noted that during Dryer's illness in October, 1938, he was still issuing checks to repay the part of the illegal fees he had received on the fictitious claims filed. This surely evidences a motive to assist in the carrying out of a scheme which, if not detected, was capable of defrauding someone. Respondent seeks to justify the check incidents by stating that it was his desire to aid Dryer in the collection of the balance of the $20,000 loan Dryer had made in 1934. His loyalty to his senior partner in such a matter is no excuse for the assistance he gave to consummate a transaction that reeked with fraud and wrong-doing from its inception.

It is, therefore, ordered that respondent, McLin J. Brown, be suspended from the practice of law for the period of six months from this date.

*Respondent suspended.*